**FRITO-LAY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 7726.**

United States District Court
N. D. Georgia,
Atlanta Division.

Oct. 26, 1962.

Smith, Kilpatrick, Cody, Rogers & McClatchey, Harry J. Mehre, Jr., Atlanta, Ga., for plaintiff.

Charles L. Goodson, U. S. Atty., Atlanta, Ga., for defendant.

MORGAN, District Judge.

This is an action by Frito-Lay, Inc., for the recovery of income taxes in the sum of $22,007.37, or alternatively, $58,993.76, paid by Frito-Lay for its taxable years 1956 and 1957.

H. W. Lay & Company, Inc.[1] (hereinafter called the taxpayer), is engaged in the manufacture of snack food products. Taxpayer is engaged in the processing of potato chips, corn chips (Fritos), fried pork skins, cheese coated puffed corn, salted nuts, peanut butter sandwiches, pretzels, and other snacks. Since the taxpayer was organized in 1939, it has experienced a phenomenal growth in the processing and sale of its products. Its sales have increased from $1,000,000 in 1939 to $45,000,000 last year. From 1951 to 1955, its sales rose from $7,000,-000 to over $11,000,000. Taxpayer is a very successful business, and has experienced tremendous growth since its organization. In 1950, taxpayer had four

---

1. H. W. Lay & Company, upon merger with the Frito Company, became Frito-Lay, Inc. Frito-Lay, Inc., was substituted as the party plaintiff by the pre-trial order.

processing facilities and two warehouses located in Atlanta, its headquarters until it merged with Frito Company of Dallas, Texas. Although it conducted a successful operation in Atlanta, there were "obvious inefficiencies of being so widely spread over the city".

For this reason, the taxpayer conducted a survey to find a location and to determine the cost of a building, and for use as a consolidated plant; and to combine its operations of its several Atlanta facilities, the company in 1950 acquired approximately 14 acres on Peachtree Industrial Boulevard, near Atlanta, at a cost to it of $49,824. The Korean War, however, delayed the taxpayer's plans for construction for several years.

Upon the termination of the Korean War, taxpayer selected Jones Construction Company (hereinafter, Jones) to construct a consolidated plant facility on its land.

In late 1955, the taxpayer and Jones performed certain acts and executed several documents which provide the background against which their relation must be viewed:

1. On August 22, 1955, taxpayer formed a subsidiary, Herlay, and, two days later, in a non-taxable transaction, conveyed title to the 14 acres of land to Herlay in exchange for all of its stock.

2. On September 14, 1955, Herlay conveyed title to Jones and received a non-interest bearing promissory note in the amount of $49,824 due December 1, 1975.

3. On the same day, September 14, 1955, taxpayer leased the land from Jones for a period of twenty years.[2]

4. On the same day, September 14, 1955, Jones conveyed to Herlay an option to purchase the land for $49,824 exercisable at the time the

twenty-year lease between Jones and the taxpayer was to expire.

In accordance with the terms of the "Indenture of Lease", Jones constructed a plant on the land at a total cost of $1,579,910, which included a $75,000 construction fee. Further, the lease provided for a payment of 7½% of the total cost to be paid annually by the taxpayer to Jones in quarterly installments. Taxpayer has characterized these payments as "rent".

On its income tax returns for the fiscal years ending August 31, 1956, and August 31, 1957, the taxpayer claimed as deductions for "rent", the amounts of $88,869.78[3] and $118,493.24, respectively, which were paid to Jones under the "Indenture of Lease". The taxpayer did not claim any depreciation on this building.

The Commissioner of Internal Revenue determined that the alleged rentals were actually payments used to acquire an equity in the property and disallowed their deduction.

However, the Commissioner allowed certain additional deductions to the taxpayer. First, certain deductions were allowed as interest. The Commissioner treated the total cost of the plant, $1,579,910, as principal, and the remainder of the payments, totaling $2,369,865.60, as interest, giving an interest rate of 4.331%. This produced deductions for interest paid of $50,920.51 in fiscal 1956, and $65,945.44 in fiscal 1957. Secondly, the Commissioner allowed depreciation on the building to be used. In so doing, the Commissioner determined that the building had a useful life of 50 years, and, inasmuch as the taxpayer had not elected any other method of depreciation, the straight-line method was used (2% of $1,579,910 deducted annually). The depreciation allowed was $23,698.65 for fiscal 1956 and $31,598.20 for fiscal 1957. However, since the original assessment, taxpayer has elected to use the double

2. Still later, on December 20, 1955, the lease was amended to provide that Lay "only has a usufruct".

3. Inasmuch as the rent for the first fiscal year did not cover a full 12-month period, it was prorated. However, for subsequent years, the annual figure is $118,493.24.

declining balance method of depreciation. The Government does not contest the validity of this election. Also, new guidelines for depreciation have been issued (See Revenue Procedure 62–21.) These new guidelines, which are available to the taxpayer, provide a ceiling of 45 years for factories. Accordingly, at the trial defendant limits its contention with respect to useful life to 45 years.

The taxpayer, in the alternative, contests the Commissioner's determination, and urges a useful life of 33⅓ years.

Two questions presented for determination by this Court are:

1. Whether the annual payments made by Frito-Lay, Inc., to Jones Construction Company constituted rent or partial payments on the purchase price of the building and land.

2. If the payments were partial payments on the purchase price of the building and land, for depreciation purposes, is the useful life of the building 45 years as contended by the defendant or 33⅓ years as contended by the taxpayer?

## DISCUSSION

In answering Question 1, the question is whether the taxpayer, by not relinquishing control of the land in this case, has an equity in the property, or whether or not the taxpayer has taken, or is taking, title to the property.

■■ Under Section 162(a) (3) of the Internal Revenue Code of 1954, the taxpayer is entitled to a "trade or business expense" deduction for:

"(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

Thus, if the taxpayer has taken title, is taking title, or is acquiring an equity in the property, it cannot treat the payments as rent. These conditions are stated in the alternative, and it is not necessary that the taxpayer acquire an equity by each payment; "it is enough that the lease provides a right * * * to take title to the premises for which the rental was paid". Oesterreich v. Commissioner, 226 F.2d 798, 802 (C.A. 9th) (dealing with the similar provision, Section 23(a) (1) (A), of the 1939 Code). In determining the character of any arrangement for tax purposes, the substance rather than the form is controlling (Commissioner v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981) and that leases or terms of leases may be disregarded under this principle is well established. W. H. Armston Co. v. Commissioner, 188 F.2d 531, 26 A.L.R. 2d 698 (C.A. 5th); Southwestern Hotel Co. v. United States, 115 F.2d 686 (C.A. 5th).

■■ In construing a transaction as a sale or a lease, a mere labelling it "lease" does not control the legal consequences if, in fact, the transaction amounts to a sale. Starr's Estate v. Commissioner, 274 F.2d 294 (C.A. 9th). The practical realities or substance of the transaction govern its tax purposes. It is well settled that, regardless of the form of the transaction, the so-called "rental" payments must be treated as partial payments on the purchase price of the property involved when, by virtue thereof, the taxpayer acquires, or will acquire, title to, or an equity in, the property. Robinson v. Elliott, 262 F.2d 383 (C.A. 9th).

■ Thus, in determining the proper legal consequences of a transaction, the Courts will look to the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed. Haggard v. Commissioner, 241 F.2d 288 (C.A. 9th); Benton v. Commissioner, 197 F.2d 745 (C.A. 5th).

This Court feels that the transactions between Frito-Lay, Inc., the wholly-owned subsidiary Herlay, and Jones Construction Company cannot be viewed in-

dependently of one another,[4] nor can this "Lease Indenture" be properly compared with other leases of other property where the taxpayer had no option to purchase. The question of intent in a particular case is a question of fact, and the case of Benton v. Commissioner, 5 Cir., 197 F.2d 745, is clearly distinguishable on the facts of the case at hand. The Benton case enunciates the principle that the intention of the parties control (197 F.2d at Page 752):

> "Whether what is in form a lease is in effect a conditional sale contract depends on the intention of the parties."

■ While it is true that not every lease containing an option to purchase may be held primarily a sales contract, the decision ultimately depends on the intent of the parties and is governed to a large extent by the particular facts in each case. Cf. Jefferson Gas Coal Company v. Commissioner, 52 F.2d 120 (C.A. 3rd); Burnet v. Hutchinson Coal Co., 64 F.2d 275 (C.A. 4th), cert. den. 290 U.S. 652, 54 S.Ct. 69, 78 L.Ed. 565; Burroughs Adding Machine Co. v. Bogdon, 9 F.2d 54 (C.A. 8th); Beus v. Commissioner, 261 F.2d 176 (C.A. 9th); Breece Veneer & Panel Co. v. Commissioner, 232 F.2d 319 (C.A. 7th); Benton v. Commissioner, 197 F.2d 745 (C.A. 5th).

■ The Fifth Circuit Court of Appeals, in the Benton case, supra, has ruled that a mere mechanical application of economic factors is erroneous and that other circumstances bearing on the intent of the parties should be considered. Furthermore, these factors must not be considered retrospectively—determination is to be made in the light of the facts and circumstances as they existed at the time the parties entered into the contract.

The facts in the instant case are in sharp contrast with those in the Benton case. In the Benton case, the option price, although less than the value of the property ($35,000), approached the total amount ($50,000) paid as rent. The option price was substantial in relation to total rent paid.

In the instant case, the option price is $49,824. Its importance in relation to the total rent paid over twenty years (over $2,000,000) is negligible, particularly in view of the fact that it can be paid by merely cancelling a note. The price for which Herlay, acting under directions of Lay, will acquire the property upon exercise of the option is the 1950 price of the land alone. At the time the option was executed, it was definite that a plant costing in excess of $1,500,000 would be constructed on the land. Thus, in 1955, the parties set an option price by reference to the 1950 price of the land, when it was known that a plant of great cost would be built thereon.

Originally, Lay owned the land, having bought it in 1950 as a plant site, with the intention of itself constructing a plant thereon. At a later date, Lay itself intended to lease the land to Jones, a contractor, and have the land leased back to Lay. Title under both plans would remain with Lay. However, financing difficulties experienced by Jones necessitated that the taxpayer change its plans. Lay then created its wholly-owned subsidiary (Herlay), transferred title to Herlay, required Herlay to convey title to Jones (but retain an option to purchase), and then lease the land back from Jones. The formation of Herlay preceded, by less than a month, the execution of the principal documents in this case.

Herlay was formed for the sole purpose of taking title to the land from its creator, and it has no assets other than the note and the option to purchase. The officers of Herlay are principally the same as the officers of the taxpayer.

---

4. Mr. George Williamson, Vice-President of taxpayer, and former Secretary and Treasurer of Lay, testified that Herlay, Lay's fully-owned subsidiary, would not have accepted the non-interest bearing note unless the lease was drawn in favor of Lay without getting the option to purchase.

These facts distinguish the taxpayer's arrangements from the Benton case, for in Benton, the first connection of the lessee with the property was as lessee. Lay, however, owned the land from the beginning and, by retaining an option in favor of its subsidiary, guaranteed that it would never lose control of the land.

■ Taxpayer relies on the case of Fishing Tackle Products Co. v. Commissioner, 27 T.C. 638, in arguing that Lay Company does not have an option to purchase the land. The instant case before this Court is distinguishable from the Fishing Tackle case. In the Tax Court case, each corporation was an operating entity, engaged in an active business, and the business of the subsidiary and the business of the parent were separate and distinct. However, in the instant case, Herlay is an inactive entity, created solely to play a role in the taxpayer's negotiations with Jones. In the Tax Court case, the lessee, being a subsidiary, could not require the parent to do its bidding, while in the instant case, lessee Lay Company, as parent, could control its subsidiary as it desired. Thus, the taxpayer and Herlay cannot be treated as completely separate entities, and the carefully coordinated activities of both must be considered in determining the intent of the parties. See Paymer v. Commissioner, 150 F.2d 334 (C.A.2d).

Although none of the cases cited are factually in point, they clearly establish intention as the one true guide in determining whether a transaction is a lease or a sale.

In the case of Oesterreich v. Commissioner, 226 F.2d 798, 801 (C.A. 9th), the Court stated that "to determine just what it is the courts will look to see what the parties intended it to be". It is "well settled that calling such a transaction a 'lease' does not make it such, if in fact it is something else".

In Oesterreich, the parties entered into a "lease". However, the Court held, at Page 802 of 226 F.2d, that the parties had entered into a sale, principally because "at the expiration of the lease it (the 'lessee') can acquire the premises now worth $100,000 for the token consideration of $10". The Court noted (Pages 802–803 of 226 F.2d):

"Although there have been cases holding that a mere option to buy at the expiration of the time period does not turn a lease into a contract of sale, Benton v. Commissioner, supra, [5 Cir.] 197 F.2d 745; Indian Creek Coal & Coke Co., 1931, 23 B.T.A. 950; Haverstock, 1928, 13 B.T.A. 837, it should be noted that in all of these cases, the option price constituted full consideration for the premises or goods acquired. In each of these cases it was always questionable whether or not the options would be exercised. Here there is virtually no question of this, for not only will Wilshire Holding Corporation acquire valuable land for a mere $10 but it will forfeit a $350,000 building now on the premises to the lessor if it does not decide to pay the $10 and take title. The testimony clearly shows that the Wilshire Holding Corporation during all of the original negotiations was very much concerned with what would happen to its building and the land after the lease expired and would not have agreed to the 'lease' unless it provided that title would vest in Wilshire."

■ Similarly, in the instant case, it cannot be said that the option price (geared to the 1950 price of the land alone) is a full consideration for the land and a building which were worth over $50,000 and $1,570,000 respectively in 1955. The option agreement expressly relates the option price of $49,824 to "the price this day contracted to be paid by Jones to Herlay for the said described real estate represented by Jones' note". The time at which the option may be exercised is tied to the expiration date of the twenty-year lease between Jones and the taxpayer. Further, payment of the option price may be accomplished merely by redelivering the same note to Jones,

having marked the same "Satisfied in Full". Such payment is nothing more than a formal matter.

Another point made by the Court in Oesterreich, as quoted above, is that the "lessee" was very much concerned with what would happen to its building and the land after the lease expired. This parallels the situation in this case. The taxpayer did not let the land or the building get beyond its control. Taxpayer's Vice-President testified on the trial that the company did not want to get rid of the land, and transferred title merely because of a technical point. In the broad sense, Lay never relinquished title to the property. The fact that the amount payable to Jones would be a reasonable rental is coincidental to the financing arrangements. Thus, this Court holds that taxpayer has "taken" title to the land and building because it never relinquished title. At the very least, taxpayer has failed to establish that it is not acquiring an equity in the land and building.

The second question to be decided is the useful life of the property for purposes of computing depreciation, or, putting the question another way—what is the useful life of the building, 33⅓ years as contended by the taxpayer, or 45 years as contended by the defendant. The statute involved in this question is quoted below:

"§ 167. Depreciation

"(a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)

—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

██ On the trial of the case, attorneys for the defendant conceded that the taxpayer could use the double declining balance method of depreciation, and that the Government does not now contest the validity of this election. The de-

fendant further concedes that, since the issuance of new guidelines for depreciation, under these guidelines the useful life of the plant is now 45 years. So now the remaining point in controversy under Count Two is the question of the normal useful life of the building in question. Plaintiff contends that the improvements in question have a useful life not in excess of 33⅓ years. The detailed evidence offered by plaintiff on this subject justifies a finding of a useful life of 33⅓ years. The evidence produced on the trial indicated that the snack food industry, and the processing methods utilized, are subject to substantial and continuing technological development and change. Indeed, the past experience of taxpayer since 1939 clearly indicates that its processing plants are constantly undergoing substantial changes because of developments in the industry. The guideline of 45 years for factories (Revenue Procedure 62–21) is not a reasonable allowance for normal obsolescence in the determination of a useful life of the building in question.

## FINDINGS OF FACT

1. This is an action for the refund of United States income taxes paid to the defendant by the plaintiff for its taxable years 1956 and 1957. The Court has jurisdiction of this matter under 28 U.S.C. § 1346(a) (1). Venue is proper and this suit is timely. All procedural prerequisites to bringing this suit have been satisfied. After the institution of this action, Frito-Lay, Inc. (the resulting corporation of the merger of H. W. Lay & Company, Inc., and The Frito Company), was properly substituted as the plaintiff in this action.

2. In 1950, H. W. Lay & Company, Inc. (hereinafter called Lay) purchased the land upon which is located the building in question (known as 4950 Peachtree Industrial Boulevard, Chamblee, Georgia) for a price of $49,824.

3. Lay acquired the land for use as a consolidated plant operation for its scattered Atlanta activities. However,

the Korean War interrupted Lay's plans to construct a new facility.

4. After the close of the War, Lay selected J. A. Jones Construction Company (hereinafter, Jones) to construct the consolidated plant facility. Originally Lay itself intended to lease the land to Jones and have the land leased back to Lay. However, financing difficulties experienced by Jones necessitated that the arrangement be altered.

5. On August 22, 1955, Lay created Herlay, Inc. Herlay was formed for the sole purpose of taking title to the land from Lay. It has no assets other than the note and the option to purchase, referred to in Paragraph 7 below. The officers of Herlay are principally the same as the officers of the taxpayer.

6. On August 24, 1955, Lay conveyed the land to Herlay in a non-taxable exchange for all of the then authorized capital stock of Herlay. After the conveyance, the tax basis of the land in the hands of Herlay was $49,824.

7. On September 14, 1955, Herlay, by a Warranty Deed, conveyed fee simple title to the land to Jones. As consideration for the conveyance, Jones gave Herlay its non-interest bearing promissory note in the amount of $49,824 payable to Herlay, dated September 14, 1955, and due on December 1, 1975. Jones also conveyed to Herlay an option to purchase the land for $49,824, exercisable at the time the twenty-year lease (referred to in Paragraph 9 below) between Jones and Lay was to expire.

8. Herlay would not have accepted a non-interest bearing note from Jones, unless the lease was drawn in favor of Lay and unless Herlay received an option to purchase the land.

9. On September 14, 1955, Lay and Jones entered into an "Indenture of Lease", whereby Jones leased the land to Lay for a period of twenty years.

10. Pursuant to the Indenture of Lease, Jones constructed a building on the land to Lay's specifications at a cost of $1,579,910, which included a $75,000 construction fee. Said $1,579,910 was the cost figure used in computing the 7½ percent of cost amount payable annually from Lay to Jones under the terms of the Indenture of Lease.

11. In December, 1955, Jones borrowed $1,200,000 from the New England Mutual Life Insurance Company at 4½ percent per year in order to aid in financing the construction of the plant. On December 20, 1955, Jones executed a Georgia Deed to Secure Debt in favor of New England Mutual Life Insurance Company, and made a collateral assignment of its interest in the Indenture of Lease to the New England Mutual Life Insurance Company.

12. On December 20, 1955, an amendment to the lease was executed at the request of the New England Mutual Life Insurance Company as a condition of its making the loan to Jones. This amendment limited the estate passing from Jones to Lay under the Indenture of Lease to a "usufruct".

13. Pursuant to the Indenture of Lease, Lay performs all of the functions incident to ownership with respect to the land. Lay pays all taxes, utilities, and insurance, and maintains the plant and other improvements in good repair.

14. The total payments which will be made to Jones over the twenty-year lease are $2,369,865.60. This total, spread over a twenty-year period, and stemming from a cost or principal of $1,579,910, provides an annual interest rate of 4.-331%.

15. On its income tax returns for the fiscal years ending August 31, 1956, and August 31, 1957, Lay claimed as rent deductions the amounts of $88,869.78 and $118,493.24, respectively, which were the annual payments to Jones under the Indenture of Lease. Lay did not claim depreciation on the building.

16. The Commissioner of Internal Revenue determined that the alleged rentals were actually payments used to acquire an equity in, or title to, the property and disallowed their deduction. However, the Commissioner allowed certain additional deductions. Deductions

for interest in the amount of $50,920.51 and $65,945.44 were allowed for the respective taxable years 1956 and 1957. In addition, the Commissioner allowed depreciation on the building. In so doing the Commissioner determined that the building had a useful life for 50 years and, inasmuch as the taxpayer had not elected any other method of depreciation, the straight line method was used. The depreciation allowed for the taxable years 1956 and 1957 was $23,698.65 and $31,598.20, respectively.

With respect to the method of depreciation, Lay has, since the original assessment, elected to use the double declining balance method of depreciation. In addition, new guide lines for depreciation have been issued which provide a ceiling of 45 years for the useful life of Lay's plant.

17. The land is well located in an industrial area, and at the time of the negotiations between Jones and Lay, it was foreseeable that the value of the land would rise. The land and the building today are together worth approximately $1,400,000.

18. The building for the purpose utilized (processing of snack food products) has a useful life not in excess of 33⅓ years.

19. The technological developments in the plaintiff's business have caused obsolescence in the previous buildings utilized by taxpayer, and the present building of taxpayer will not have a useful physical life in excess of 33⅓ years.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter and the parties herein.

2. For tax purposes, the annual payments from Lay to Jones under the Indenture of Lease do not constitute rent. Rather, by these payments, Lay has taken, or is taking, title to, or is acquiring an equity in, the land and building in question. Accordingly, the plaintiff is not entitled to deduct the annual payments as rent in computing its income tax liability for its fiscal years ending August 31, 1956, and August 31, 1957.

3. For depreciation purposes, the useful life of the building in question is 33⅓ years.

4. (a) Plaintiff is entitled to deductions for depreciation of the building in question in the computation of its income tax liability for its fiscal years ending August 31, 1956, and August 31, 1957. Plaintiff's original basis for said depreciation is $1,579,910, with depreciation allowable on said basis commencing on December 1, 1955, the date plaintiff began to occupy and use the building in question, which was then a new building and had never theretofore been occupied or used. The plaintiff is entitled to use the double declining balance method of depreciation.

(b) Plaintiff is entitled to an interest deduction in the computation of its income tax liability for its fiscal years ending August 31, 1956, and August 31, 1957, with respect to the payments made to J. A. Jones Construction Company under said agreement entitled "Indenture of Lease" based upon the assumption that the excess over $1,579,910 of the aggregate amount of all sums payable to Jones under the terms of said agreement constitutes interest, the resulting interest rate being 4.331 percent per annum on the unpaid balance of an original principal amount of $1,579,910.

5. Counsel for the defendant is directed to prepare a judgment and present the same to the Court in accordance with the Findings of Fact and Conclusions of Law above stated.