Paul W. Frenzel and Paula S. Frenzel, et al. [1] v. Commissioner. Frenzel v. Commissioner
Docket Nos. 92030-92033, 92037, 92846-92850.
United States Tax Court
T.C. Memo 1963-276; 1963 Tax Ct. Memo LEXIS 70; 22 T.C.M. (CCH) 1391; T.C.M. (RIA) 63276; October 7, 1963
*70 The petitioners leased warehouse space to a large manufacturing company and had already constructed one warehouse specifically for its use. Despite their inability to obtain financing they began construction of a second warehouse which was leased to this same company for ten years with two options to renew. They subsequently sold this second warehouse to a trust company for an amount equal to the total cost of the land and warehouse. They also leased the land and warehouse back from the trust company for ten years at an amount sufficient to amortize the purchase price over the 10-year term plus 5 percent of the unamortized balance outstanding. In addition, they received an option to repurchase at the end of the primary term or any renewal period. Under this lease agreement with the trust company the petitioners retained all the risks, responsibilities and duties of an owner of real property. Held: In substance this was simply a financing arrangement whereby the petitioners were acquiring an equity in the property with each payment. Consequently no rental deduction is allowable under section 162(a)(3) of the 1954 Code. Held, further: The petitioners are entitled to an interest *71 deduction for all of the financing charges under section 163 of the 1954 Code. Held, further: For purposes of depreciation petitioners are entitled to a useful life of 25 years on the first warehouse, and a useful life of 30 years on the second warehouse, and their basis for the latter warehouse is $1,025,505.07, their cost, under section 167(f) of the 1954 Code. Fallon Kelly, 200 Drovers Bank Bldg., S. St. Paul, Minn., and Hyam Segell, for the petitioners. Robert F. Cunningham, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: The Respondent determined deficiencies in petitioners' income taxes for the years 1957, 1958, and 1959 as follows: Docket
Petitioner
No.
Year
Amount
Paula S. and Paul W.
Frenzel
92030
1957
$2,895.28
1958
7,919.39
92847
1959
7,385.49
Ruth P. and William
E. Frenzel
92033
1957
1,876.92
1958
5,401.24
92849
1959
5,414.84
Marjorie R. and Don-
ald G. McNeely
92031
1957
2,377.47
1958
7,580.83
92846
1959
6,512.67
Josephine M. and
Harry G. McNeely,
Jr.
92032
1957
2,479.26
1958
5,714.80
92850
1959
5,621.18
Peter M. Frenzel
92037
1957
2,303.29
1958
6,728.09
92848
1959
6,578.57
*73 Due to concessions by the parties the remaining issues are: 1. Whether payments made by the petitioners to the First Trust Company of Saint Paul on the second warehouse qualify as rental deductions under section 162(a)(3) of the Internal Revenue Code of 1954. 2. If these payments to First Trust are held not to be deductible as rent then the following issues must also be decided: (a) Whether the petitioners are entitled to an interest deduction on the payments and how it is to be calculated. (b) Whether the depreciation on the warehouse should be based on an economic useful life of less than 50 years. (c) The petitioners' basis in the warehouse. (d) Whether depreciation on the warehouse may, in the alternative, be calculated on the economic useful life of its component parts and determined by any of the conventional methods allowed by the regulations, and 3. Whether the depreciation to be allowed on the first warehouse should be based on an economic useful life of less than forty years. Findings of Fact Some of the facts have been stipulated and are so found. The petitioners, Paula S. and Paul W. Frenzel; Ruth P. and William E. Frenzel; *74 Marjorie R. and Donald G. McNeely; and Josephine M. and Harry G. McNeely, Jr., are husbands and wives. Together with the petitioner, Peter M. Frenzel, they filed their income tax returns for the years in question with the district director of internal revenue in Saint Paul, Minnesota. All of the petitioners are on a calendar year basis and the cash receipts and disbursements method of accounting. Certain of the petitioners and others formed a group which is engaged in the business of owning and renting industrial properties under the name of "Undivided Real Estate." These petitioners (hereinafter referred to as "the petitioners" since the other petitioners are joined only as the co-signers of the joint returns) and their interests in the properties are as follows: Name
Interest
Paula S. Frenzel
1/10
William E. Frenzel
1/10
Peter M. Frenzel
1/10
Donald G. McNeely
1/10
Harry G. McNeely, Jr.
1/10
Others
5/10 Throughout all the years involved Undivided Real Estate kept its books on a calendar year basis and upon a cash receipts and disbursements method of accounting. Although not an actual partnership, it filed partnership information returns (Form 1065) *75 with the district director of internal revenue with the district director of internal revenue in Saint Paul, Minnesota. William E. Frenzel is the manager of Minneapolis Terminal Warehouse Company and was employed by that company during the years here involved. Donald G. McNeely has been in the warehouse business since 1946, is president of the Saint Paul Terminal Warehouse Company and during the years involved here was employed by that company. Harry G. McNeely, Jr. is vice president of the Saint Paul Terminal Warehouse Company and was also employed by that company during the years here involved. Although Paul W. Frenzel does not have an interest in Undivided Real Estate, he is interested in the properties owned by it as husband of one of the co-owners; he completely manages the interest of his wife, Paula S. Frenzel; he acquired the property later conveyed to petitioners herein and acted for and on behalf of several petitioners in various transactions herein involved as guardian or attorney in fact. He is the father of petitioners, William E. Frenzel and Peter M. Frenzel, and advised them as to the transactions. He has been a warehouseman since June 19, 1919, and is president of *76 the Capital Warehouse Company and vice president of the Saint Paul Terminal Warehouse Company, Minneapolis Terminal Warehouse Company, New YorkTerminal Warehouse Company, and Midway Terminal Warehouse Company. In either 1943 or 1944 he purchased a 56-acre tract of land for $75,000 on the east side of Saint Paul, Minnesota. This property will sometimes be referred to herein as the Case Avenue tract. On the northwesterly part of this land there were 27 old buildings which had been erected in the 1890's by the International Harvester Company. Frenzel purchased this property, which had previously been rented and operated by one of his warehouse companies, for the purpose of using the International Harvester buildings for public warehousing. They have been operated as warehouses, without interruption, ever since. Shortly after Frenzel purchased this property he conveyed it to a third party who conveyed it, together with the improvements thereon, to the Undivided Real Estate group in 1944 or 1945. Minnesota Mining and Manufacturing Company (hereinafter referred to as 3M) has leased warehouse space from Paul W. Frenzel and his companies since the 1920's and has continued to lease approximately *77 two-thirds of the usable space in the Old International Harvester buildings from petitioners since 1945. The remaining one-third of these warehouses is occupied and used by Capital Warehouse Company, of which petitioner, Paul W. Frenzel, is president. In 1951, at the outbreak of the Korean War, 3M was also renting space located at the Twin City Arsenal building in the north suburbs of Saint Paul. When the arsenal was reactivated, 3M was evicted and began to search for new accommodations. There was then a shortage of warehouse space since the economy had been expanding without a concomitant expansion of facilities. At this time 3M was already leasing 953,000 square feet of warehouse space in the Saint Paul area and following its eviction was in dire need of additional space. Since many companies were competing for 3M's business, it was pretty much able to dictate the terms of any new arrangement. The staff manufacturing department of 3M considered all phases of warehousing, including the economic advantages of building its own warehousing operations, before entering into the negotiations with the petitioners for the leasing of warehouse space. However, that department cannot make *78 any unilateral decisions as to warehousing but must have the support of the product division involved. There are 25 to 30 product divisions in 3M, 8 of which store their finished goods in the petitioners' warehouses in the Saint Paul area. These various product divisions of 3M are autonomous in the respect that they have full control over the final decision as to where their product will be stored. 3M prefers to lease warehouse space rather than to use public warehousing since it is able to control its customer service in a leasing operation. The distribution of 3M products also requires a 24-hour-a-day service, which public warehousing cannot accommodate. The petitioners desired to assist 3M, a favored customer, and to obtain its additional storage business. They had many discussions with 3M concerning their need for warehouse space but soon discovered that 3M wanted a short-term lease and would not make a long-term commitment. These discussions culminated in a lease agreement dated February 5, 1952, in which Undivided Real Estate agreed to complete construction of a warehouse, which petitioners had started on the Case Avenue tract, in accordance with plans and specifications *79 attached to the lease and to lease it to 3M for a 5-year term at a rental of $1 per square foot. 3M agreed thereunder to pay any real estate taxes in excess of 10 cents a square foot. Options to renew the lease for two additional 5-year terms at a rental of 55 cents a square foot, plus any real estate taxes, were also granted to 3M and it was given an unconditional right of assignment or sublease. The petitioners were to maintain the loading docks, roads, walks, and paved areas adjacent to or connected with the leased warehouse, but 3M obtained the right to use these areas, including the means of ingress and egress. In general, the petitioners as lessors were to pay for the taxes, insurance, and maintenance. The building (hereinafter referred to as Building No. 25) was approximately 260 feet by 401 feet and was completed in 1952 at a total cost of $439,472.31. As previously indicated, 3M was leasing 953,000 square feet of space in the Saint Paul area from various lessors in 1951 when it was doing $150,000,000 gross business. While gross business has increased to $550,000,000 as of the time of trial, leased space had been reduced to 540,000 square feet, substantially all of which *80 is rented from petitioners. In other words, despite its increase in business, its warehouse space requirements had decreased because of improvements in warehousing techniques such as the introduction of computers to control inventories. 3M is also using its leased space more and more for distribution rather than for storage. These changes are some of the prime reasons for the requirement of flexibility through a short-term lease. However, 3M did exercise its two options to renew the 1952 lease of Building No. 25 for the period from March 1, 1957, to February 28, 1962, and from March 1, 1962, to February 28, 1967. At the time of trial 3M had no plans to move its existing operations out of the Saint Paul area and all of its warehouse needs in that area were being met by petitioners or their companies. Since they were assured of only a short rental period, the petitioners constructed Building No. 25 on an economical basis. It was also true that many materials were scarce or impossible to obtain due to the war and prices for substitutes were high. For example, structural steel was unavailable except on priority order, which petitioners could not obtain. Accordingly, the trusses and columns *81 used by petitioners were made of Belgium and Strand Steel which is not normally used. As a result of this makeshift use of substitute materials, at least two additional feet of overhead room, normal for warehouses of this sort, were lost, and the resulting structural costs were abnormally increased. Due to the shortage of cement a mix of less than five bags was used for the floor resulting in a strength of $2,500 pounds instead of the normal 5 1/2 bag mix which gives a 3,800 pound concrete. The petitioners were unable to obtain steel roof decking and had to use a substitute known as Cemesto Board, which consists of two pieces of asbestos board with insulation between. No insulation was placed between the Cemesto Board and the roofing material itself. This was according to the plans and specifications attached to the 3M lease. Because of the scarcity of materials, high prices and the desire for economy, both the construction and materials were below standard in many instances. Some of the pipe for the heating system was undersized because proper sizes were not available, and the whole heating system was designed to the absolute minimum as to piping, radiation, and boiler capacity. *82 Although tests of the soil indicated piling should be used, it was not used because of increased costs. A concrete block foundation was used in lieu of the usual poured concrete wall footings. No brick was used although it is normally used in the construction of many warehouses. There were no general area floor drains, wear surfaces or hardening surfaces on the floors, and there was no effort to add any aesthetic value to the building. As a consequence of the hurried and economical methods employed and the use of makeshift and substituted materials the building was of inferior quality from the start and there was rapid deterioration. The Cemesto Board roof soon began cracking and delamination occurred which made extra center support for over 90 percent of the panels necessary, although only a small percentage of the panels themselves were actually replaced. There was also a bellying-in between the joints which required two-by-four supports. On the upper side of the roof there was considerable alligatoring, which is a wrinkling of the edges of the tarpaper caused by expansion and contraction. These wrinkles were no longer saturated with asphalt materials and dried out in the sun. *83 This drying out caused cracks and eventual leaks. In general, the roof was soon in distress due to the fact that it did not have proper expansion facilities. The roof flashing was also in distress because one corner of the building settled pulling the parapet wall with it and tearing out the corner of the flashing and preventing proper drainage. The tarpaper flashing was also torn away from the rear of the building. The floors were not sealed with a good troweled finish and consequently the sand and stone granules are visible and work loose as wheels roll over them. There is a major floor bearing failure and in some cases the floor has settled two or three inches. In these areas the floors have had to be jacked up to their original position with a machine known as a mud jack, using a mud crete for the filler. The concrete block construction is also faulty. Usually in such construction a pilaster is put every 20 feet with a construction joint in it, but here they were installed only every 40 feet and did not have built-in expansion joints. This has cause the walls to crack and they will continue to do so. For depreciation purposes the petitioners placed Building No. 25 on a 25-year *84 useful life and took straight-line depreciation. In the notice of deficiency the respondent asserted a 50-year useful life. In 1957 3M entered into negotiations with the petitioners with regard to additional space. 3M did not want a lease for longer than five years but, after long negotiations, agreed to a 10-year lease of a warehouse to be built by the petitioners. In finally agreeing to accept a 10-year lease, however, 3M gave consideration to the fact that the building would be of tremendous size and especially suited to the needs of 3M. Accordingly, they prepared a broad outline of their needs although the actual engineering was done by the petitioners. Some of the specifications required by 3M were extra illumination, indoor truck loading docks, a mechanical towveyor system, a humidification room, certain air-conditioned office space in excess of what is normally put in public warehousing, and certain clearance specifications. As was the case with Building No. 25, this building was in an optimum location for the purposes of 3M at the time it was built and at time of trial. The petitioners had extended themselves in the construction of Building No. 25 and felt that the availability *85 of their funds to build an additional building was limited. However, in their endeavor to accommodate their customer, 3M, they first explored the possibility of obtaining a mortgage loan with several people, including the First Trust Company. They wanted a mortgage of 100 percent of construction costs, but the investment committee of the First Trust Company decided not to take a mortgage even as high as 75 percent though they were aware of the fact that the petitioners were negotiating with 3M for a lease on the building. The maximum mortgage made at this time by the First Trust Company and other lending institutions was generally around 66 percent. Despite the unavailability of any financing arrangement, the petitioners executed an agreement with 3M on February 1, 1957, providing for the construction of Building No. 27 in accordance with plans and specifications attached and its lease to 3M for a period of 10 years with an option to renew the lease for 2 additional and successive 5-year terms. The rental was set at sixty-three cents (63") a square foot, plus the real estate taxes applicable to the building and appurtenances for the first 10 years, and fifty-eight cents (58") a square *86 foot, plus the above-mentioned real estate taxes for each of the two 5-year renewal periods. The petitioners were to maintain all walks, roads, paved areas, and loading docks adjacent to or connected with the warehouse, but 3M received the right to use these areas including the means of ingress and egress. As in the lease on Building No. 25, the petitioners, with minor exceptions, were to pay for the insurance, taxes, and maintenance, and 3M was granted the unconditional right to assign the lease or sublease the premises or any part thereof. Approximately six months later by contract dated August 9, 1957, the petitioners entered into an agreement with First Trust which provided that the land and building then in the process of construction, subject to the pre-existing 3M lease, would be sold to First Trust for an amount equal to the total purchase price paid by the petitioners for the land, plus the total amount paid by them for the construction of Building No. 27 and its appurtenances. The total sum to be paid, however, was not to exceed $1,200,000 and was to be paid in cash at the time of closing. All of the buyer's closing costs, including counsel fees, revenue stamps and recording *87 fees were to be paid by sellers. This provision of the contract read as follows: 6. There shall be deducted from the purchase price to be paid by BUYER hereunder its costs hereunder, including fees of counsel for BUYER, cost of revenue stamps, and recording fees. This agreement also provided that, on the date of the payment of the purchase price and delivery of deed, First Trust would execute a lease of the premises to the petitioners with a primary term of 10 years and an option to renew for 3 successive 5-year terms. The rental for the primary term of the lease was to be equal to an amount sufficient to amortize the purchase price over a 10-year period, plus 5 percent of the unamortized balance outstanding and was to be paid quarterly. The rental for the three 5-year option periods was to be an amount sufficient to produce an annual rental equal to 3 percent of the purchase price. In the lease, copy of which was attached to the agreement, 3M also granted to petitioners an absolute option to repurchase the property at the end of the primary lease term, or any renewed or extended term, for 10 percent of the purchase price. The August 9th agreement with First Trust also provided *88 that the rentals from 3M under its February lease with petitioners would be assigned to First Trust as security for the leaseback. It was necessary, however, at that time, to leave blanks in the lease for the later insertion of figures in accordance with these formulas, since at the time the agreement was executed, Building No. 27 was not yet completed and the bills for the full amount of the construction cost had not then been received. This was provided for in the agreement as follows: 4. At the time of completion of the purchase, BUYER will execute and deliver to SELLERS a lease in the form attached hereto as Exhibit A and made a part hereof. The blank spaces in said lease form shall be filled in as follows: (a) The date of the lease shall be the date of the payment of the purchase price by BUYER to SELLERS. (b) There shall be inserted in the first blank in paragraph 3 (providing for the rental), an amount sufficient to amortize the purchase price over a ten-year period, and to yield interest at five per cent (5%) per annum on the unamortized balance outstanding from time to time. (c) There shall be inserted in the second blank in paragraph 3 (providing for payment of rental *89 during the five-year renewal periods) an amount payable quarterly which shall produce an annual rental equal to three per cent (3%) of purchase price. (d) There shall be inserted in the third blank in paragraph 3 (providing for the purchase price to be paid by SELLERS in exercising their option to repurchase) an amount equal to ten per cent (10%) of the purchase price payable hereunder by BUYER to SELLERS. By deed dated August 15, 1957, recorded October 2, 1957, the petitioners conveyed 6.17 acres of land adjacent to and immediately east of Building No. 27 to the City of Saint Paul Board of Education for $40,000. The petitioners' basis for this land, was recorded on its books at $1,985.94. This was done in the settlement of a proceeding for condemnation brought by the City to acquire this part of the Case Avenue tract for school purposes. The transaction was apparently not concluded by delivery of the deed until sometime after September 17, 1957, because that is the date shown for the latest acknowledgment by one of the grantors therein; petitioners' books shown receipt of the $40,000 from the City by entry dated October 3, 1957, and as indicated above the deed was recorded October 2, 1957. We *90 find the transaction was closed and settlement made on or about October 2, 1957, with respect to this sale. By deed dated October 1, 1957, recorded December 2, 1957, the petitioners conveyed the land (7.75 acres) and Building No. 27 to First Trust. The purchase price was $1,038,415, of which $1,025,505.07 represented the cost of constructing Building No. 27 and the remainder, $12,909.93, was for the land, and, according to the agreement between the parties, was petitioners' purchase price paid by them for the land. The deed was not acknowledged by all of the grantors until after November 6, 1957, when Audrey A. McNeely acknowledged it before the United States Consul at Rome, Italy. The party wall agreement, called for by the agreement of August 9th, was likewise acknowledged by Audrey A. McNeely in Rome on November 6, 1957, and later on November 29, 1957, by officers of the First Trust Company in Ramsey County, Minnesota. These instruments were simultaneously filed for record on December 2, 1957, at 3:30 p.m. o'clock. Also the assignment of rents due petitioners from 3M under the prior lease dated February 1, 1957, called for by the agreement of August 9th, was not dated until December 2, 1957. The *91 payment schedule prepared by First Trust stated that the property was purchased November 29, 1957. By memorandum dated December 3, 1957, W. W. Ahl, assistant vice president and real estate officer of First Trust, advised various departments of First Trust that "we have purchased from Richard C. Schall, agent for various members of the Frenzel and McNeely families, properly located at Hazel and Case Streets * * *." Later in this same memorandum, Ahl stated as follows: The first quarterly payment check for $32,486.50 is attached hereto. This payment should be credited entirely to principal in the three accounts which hold an interest in the property. Hereafter, from the quarterly payments, interest at 5% is to be first deducted and the remainder applied in reduction of principal. We find that the transaction was closed and the transfer took place not earlier than November 29, 1957, and not later than December 2, 1957, and that at closing date petitioners paid to First Trust the first quarterly payment due under their agreement which was credited entirely to principal by First Trust. Building No. 27 adjoins Building No. 25 and is approximately 401 feet by 560 feet in size. The 7 *92 3/4 acre tract of land on which Building No. 27 is located had a fair market value of at least $21,000 to $22,000 at that time. The deed, however, did not provide or reserve to First Trust any easement or right of ingress or egress across the petitioners' property on which Building No. 25 is located; it is usual and customary to cross the property of Building No. 25 to get to Building No. 27, and the only then existing access to Building No. 27 was across such land. Under the leaseback of Building No. 27 to the petitioners from First Trust, the "rental" was set at $32,486.50 a quarter (which is equal to an annual rental of 55.4 cents per square foot) with options to renew for three successive 5-year terms at $7,788.12 a quarter. The petitioners, as lesses, agreed to pay for all taxes, insurance, and maintenance. They also agreed to hold First Trust harmless from all claims for injury or damage and to maintain public liability insurance for the protection of First Trust. It was agreed, unlike the two leases with 3M, that this lease would not be terminable and that there would be no abatement or reduction in rent due to damage of any kind including condemnation or an act of God. The *93 lease provided that the petitioners assign the rentals to be received from 3M to First Trust, and, as we have already pointed out, this assignment was dated December 2, 1957, about the time that the transaction was closed. First Trust did not consider there was any risk involved in the leaseback arrangement since they had the security of the 3M lease, and petitioners were obligated to make their payments in all events. After the building was completed, Walter W. Ahl, the assistant vice president of First Trust, appraised the warehouse at $1,060,000. Ahl does all of the appraisal work for First Trust. The total amount which will be received by First Trust over the 10-year period of the lease is $1,299,460, which includes interest of $261,030.05. When the petitioners executed the warranty deed for Building No. 27, they had no knowledge of which trusts represented by the First Trust Company were actually purchasing an interest in the property. The purchase price of $1,038,415 was in fact paid by three large tax-exempt trusts, namely, the Louis W. and Maud Hill Family Foundation, which contributed $538,415 or 51.85 percent of the purchase price; The Great Northern Railway Company Pension *94 Trust, which contributed $400,000 or 38.52 percent of the purchase price; and the First Bank Stock Corporation Amended Pension Trust, which contributed $100,000 or 9.63 percent of the purchase price. As the agreement of August 9, 1957, called for "rent" equal to an amount sufficient to amortize the purchase price over a 10-year period, plus 5 percent per annum on the amortized balance outstanding, a payment schedule was prepared by First Trust and a proportionate share of the $32,486.50 quarterly rental payment was divided in accordance with the foregoing proportions among the three trusts. Quarterly rent notices, which are different from mortgage notices, were sent out by First Trust. Records were kept by the real estate department of First Trust to record the payment of rent, the amortization of the real estate, and the income that was being derived from the property. On these records the proportionate share of the quarterly rents was shown in total and this sum was then divided and apportioned between principal and interest. These records were standard form journal records of First Trust in which the word "interest," as used, meant trust income. The customary practice in a mortgage *95 loan arrangement is to allocate a portion of each payment to income and charge the rest to principal thereby reducing the value of the loan. Insofar as the mechanics of bookkeeping are concerned, the procedures used by First Trust in this sale and leaseback arrangement are the same as they would be if a mortgage had been given except that in the case of a mortgage the first payment would not be credited completely to principal if interest were then due on the loan. First Trust will write off the purchase price over the 10-year period of the lease without including the option purchase payment in this schedule. The records of the trust accounting department are different from the records maintained in First Trust's tax accounting department due to the different purposes for which they are kept. The trust accounting department must account to the life tenant and to the remainderman as well as the courts. In this department there is a separate accounting for income in each trust but there is no account in which depreciation of property is shown or taken; however, in effect the same result is reached by writing off or amortizing the principal over the term of the "lease." Since the 3 *96 trusts involved here are all tax-exempt trusts, even the tax accounting department would not show any account for depreciation. Had these trusts been taxable, the tax department would have had to report the full rental income less depreciation, but the trust accounting would have been the same. In the amortization of an investment, First Trust makes no distinction between real estate where there are options to repurchase and real estate where there are no options to repurchase. As in all other similar trusts, the basic philosophy employed by First Trust with respect to Building No. 27 was to protect the principal of the trust by amortizing it as reasonably and as quickly as they felt was necessary to protect the beneficiaries of the trust. When Building No. 27 was constructed, the aim of petitioners again was to hold the cost of the building to the absolute minimum. However, at the time of its construction, they were able to purchase standard steel and standard bar joists as well as standard roof decking. The petitioners were thus able to obtain a 20-foot clearance height in Building No. 27. Nevertheless, concrete block footing walls were erected which are not normally used as *97 foundations. Although they were able to use a 5 1/2 bag cement mix for the floor they did not put on additives. The roof was held to a minimum by installing a standard flat pitch and gravel roof over a one-inch insulation. No expansion joints were put in the roof and it was not broken up into small areas to allow for expansion. With the exception of a small area in front of the office portion, no consideration was given to aesthetic values even though it is normally done and would have enhanced the value of the warehouse. As a consequence of the economies employed, serious trouble developed with the roofing on Building No. 27. There has been a splitting down through the roofing material, and the roofing membrane has been shrinking away from the parapet walls. As a result the roofing membrane had to be broken up into smaller areas. The roof also developed leaks immediately after construction which have persisted until the present time, and leaks have been noted no a record kept by the petitioners in as many as 80 different locations. The Chicago Testing Company, consulted by petitioners when roof difficulties developed, suggested that the roof be replaced rather than maintained. *98 In 1961 an additional warehouse, Building No. 24, was built by the petitioners at a cost of approximately $1,250,000. This building became necessary when 3M informed the petitioners that they would no longer stay in some of the old International Harvester buildings. The south wall of Building No. 24 and the north wall of Buildings No. 25 and No. 27 is a party wall. In 1962 3M was leasing approximately 84,000 square feet of the 250,000 square feet in Building No. 24, and the balance was being used by Capital Warehouse Company for public warehousing. For the sake of economy in the purchase of electricity, a change was made in the feeder system of Building No. 25. Prior to the construction of Building No. 24, Building No. 25 was fed from a separate transformer bank on a separate meter. In 1961, since this was uneconomical in the purchase of electricity, a new feeder system was put in from Building No. 25 to the transformer bank in Building No. 27 from which the petitioners were purchasing power at a different rate. This same feeder system also feeds power to the new Building No. 24, and all of the electricity thus comes in on a single meter. Although Buildings No. 25 and No. 27 have *99 two separate heating systems, the boilers are tied together so that either of the boilers, or both, may be used to heat both buildings, depending on the nature of the load. The boiler in Building No. 27 was used to furnish heat to Building No. 25 during the years 1957-1959. This system also heats Building No. 24 which, although it has its own complete heating system, has no boiler. In order to heat Building No. 24 it was necessary to make changes in the heating system of Building No. 27 of around $5,000. The principal advantages of such a heating system are economy of operation and installation. The use of party walls also prevents heat losses and causes greater economy. These changes were all effected by petitioners at their expense. In the notice of deficiency the Commissioner asserted a 50-year useful life for Building No. 27. Findings of Ultimate Facts After carefully examining the whole record we find that: 1. The substance of the transaction between petitioners and the First Trust Company as to Building No. 27 was a financing arrangement, not a lease, and that thereunder petitioners were acquiring and building up their equity with each payment, not paying rent for the *100 use of that property. 2. The useful life of Building No. 25 is 25 years. 3. The useful life of Building No. 27 is 30 years. 4. The useful life of the component parts of Building No. 27 is as follows: Useful Life
Component Part
(Years)
Roof
15
Electric door opener
10
Heating and Plumbing System:
20
Heating element
12
Piping
25
Boiler
15
Oil Burner
5
Electrical Equipment:
25
Conduit wiring
25
Light reflectors
13
Circulating devices
15
Overall economic life of heating plant
17
Overall economic life of plumbing
25
Air conditioning
15
Railroad trackage
18
Overhead doors
15
Asphalt driveway
10
Sprinkler system
20
Opinion In denying the rental deductions taken by petitioners under section 162(a)(3)[2] of the 1954 Code, the respondent has made a two-pronged argument. First, he contends that the transaction is an installment sale rather than a lease from First Trust, and that the petitioners are either taking title to or acquiring an equity in the property. Second, he argues in the alternative that the whole transaction is nothing more than a financing arrangement, and that the petitioners are thus acquiring an equity in the *101 property with each payment. The statement in the notice of deficiency that the petitioners have acquired or are acquiring an equity in the property sufficiently raises both of these arguments. Had the petitioners simply made a sale and leaseback here we would have no difficulty in allowing the rental deduction. It is usually only upon a showing that the parties are related or that the transaction is in effect a sham that this deduction is disallowed. White v. Fitzpatrick, 193 F. 2d 398 (C.A. 2, 1951), certiorari denied 343 U.S. 928 (1952); Van Zandt v. Commissioner, 40 T.C. - (August 8, 1963). *102 However, the leaseback contained an option to repurchase. The petitioners would overlook the fact that in the case at bar title has taken the complete ambit back to the original owner, and they rely upon the line of decisions dealing with a lease and option to purchase. The lease with option to purchase is often difficult to classify since it is in actuality a hybrid arrangement. It has some of the characteristics of both a sale and a lease, and in order to determine its true nature "it is necessary to ascertain the intention of the parties as evidenced by the written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed." D. M. Haggard, 24 T.C. 1124 (1955), affd. per curiam, 241 F. 2d 288 (C.A. 1956). Even if the parties enter into an agreement which they believe to be a lease but which has all the characteristics of a sale, it is nevertheless treated as a sale for tax purposes. East Coast Equipment Co., 21 T.C. 112 (1953), *103 affd. 222 F. 2d 676 (C.A. 3, 1955); Judson Mills, 11 T.C. 25 (1948). In like manner, if the characteristics are those of a financing arrangement, it will be so treated. It is the substance and not the form which is controlling. Commissioner v. Court Holding Co., 324 U.S. 331 (1945), reversing 143 F. 2d 823 (C.A. 5, 1944), and affirming 2 T.C. 531 (1943). In the present case one factor which might point to a sale rather than a lease is the comparison of the option price to the estimated fair market value of the property at the time the option could be exercised. An expert witness for the petitioners estimated that the value of the property in 1967 would be around $100,000 or about the same as the option price. However, he did not consider the 3M lease in this valuation since there was no certainty it would be renewed, and his estimate of value is without regard to renewal of that lease. It is true that there is no certainty that 3M will renew its lease, but indications that it will are found in these facts: That Building No. 27 was built especially for its use and according to its specifications at an optimum *104 location for 3M; that it has exercised both options to renew the lease on Building No. 25; that it has rented additional space in the new Building No. 24; that it has no plans to move its existing department out of the Saint Paul area; that it has continuously rented warehouse space from Paul W. Frenzel and his companies since the 1920's and from these petitioners at this location since 1945; and that substantially all of its warehouse space in the Saint Paul area is leased from petitioners now at this location. We find that renewal by 3M is highly probable and that this probability should enter into any valuation of Building No. 27 as of the expiration date of the primary lease term in 1967. The 3M lease increased the 1957 valuation 5 to 7 times, according to petitioners' own evidence, and we find that its probable renewal increases the estimated value for 1967 from 4 to 5 times. However, we do not decide whether this differential between option price and fair market value would be sufficient indication that a sale and not a lease was intended. Nor do we deem it necessary to discuss the other facts here present which point to a sale rather than a lease. In determining the economic *105 reality and substance of the arrangement we must examine the transaction as a whole. Here, the petitioners simultaneously sold the property to First Trust and then leased it back with an absolute option to repurchase at the expiration of the lease or at the end of any of the three renewal periods. The fact that the petitioners were the original owner distinguishes the present case from the long line of decisions involving a lease with option to purchase since in those cases the taxpayer's initial contact with the property is as lessee and not as owner. See Frito-Lay, Inc. v. United States, 209 F. Supp. 886 (N.D. Ga., 1962). In Frito-Lay, Inc. v. United States, supra, the taxpayer transferred land to its wholly owned subsidiary which sold it to a construction company for a promissory note of $49,824; fee simple title was conveyed by warranty deed; the taxpayer leased the property from the construction company for 20 years with the understanding that a plant would be built on the land; and the subsidiary was given an option to buy the property at the end of the 20-year lease for $49,824. The plant cost over $1,500,000 and the lease was for 7 1/2 percent *106 of this amount annually. The taxpayer and its wholly owned subsidiary were treated as a single entity resulting in a basic-fact pattern which is the same as in the present case, i.e., a sale with a leaseback and option to repurchase. The Court held in language particularly appropriate to the present case that: In the broad sense, Lay never relinquished title to the property. The fact that the amount payable to Jones would be a reasonable rental is coincidental to the financing arrangements. Thus, this Court holds that taxpayer has "taken" title to the land and building because it never relinquished title. At the very least, taxpayer has failed to establish that it is not acquiring an equity in the land and building. In the same manner, the petitioners in the case at bar have retained and therefore "taken" title to Building No. 27 within the meaning of section 162(a)(3), or at the very least have failed to establish that they are not acquiring an equity in the property by virtue of the payments. Further examination of the facts demonstrates this. In the two leases with 3M the petitioners as lessors were to pay for the taxes, insurance, and maintenance, but even though they were *107 the lessees from First Trust, they still paid these expenses. It is, of course, not unusual for a lessee to assume such obligations. However, when they are coupled with the rather unusual facts that First Trust even required petitioners to hold it harmless from all claims for injury or damage and to maintain public liability insurance protecting First Trust and that the lease was not terminable and did not allow for an abatement or reduction in rent in case of damage due to a casualty or act of God, it is amply demonstrated that the petitioners retained all the duties and risks of ownership. Not only did First Trust lack any of the duties or liabilities of owner-ship, but, like a mortgagee, it had an unqualified right to payment. In sum, the petitioners retained the rights, risks and responsibilities of ownership but gave up bare legal title with a strong string firmly attached in the form of an option by which they could reinvest themselves with that title when the property was paid for. The only actual change brought about by this transaction was the transfer of legal title to First Trust, subject to the option, in exchange for $1,038,415 in cash. Since the petitioners retained all *108 the duties and obligations of ownership there was no advantage in relinquishing the bare legal title which would, admittedly, be of considerable value even in 1967. In fact, the only possible advantage to the petitioners in the whole transaction was the immediate use of $1,038,415. If we strictly follow the form of the documents, then it is incumbent upon us to ask why the petitioners were willing to construct a building and immediately sell it and the land on which it stood at cost. In fact the land had a fair market value of at loast $21,000 to $22,000 but was sold for only $12,909.93. That it was even more valuable is indicated by the sale of a smaller adjoining tract by petitioners at about the same time for $40,000. Even more puzzling is why they would then lease the improved property back for an amount which exceeded the sale proceeds they had just received by $261,030 or over 25 percent. The only logical answer to this enigma is that the petitioners wanted the use of the money obtained from "the sale." In reality, they wanted a mortgage or any financing arrangement to pay for the new warehouse. This is borne out by the fact that they had made initial efforts to secure financing *109 without success. They did not wish to tie up their capital in this building and hoped to borrow sufficient funds to pay for erecting it. Since they could not even obtain a 75 percent mortgage loan they were able to accomplish their objective through the sale-leaseback-option arrangement. First Trust's preference for this arrangement might be explained by the fact that they obtained title to the property at cost, and consequently would have a sounder investment in the eyes of the bank examiners and the courts to which the three trusts would have to account. Their loan committee would not authorize a 75 percent loan but they were willing to pay 100 percent of cost in a purchase for the three trusts for which they acted, particularly since their appraisal showed a higher value. Although 3M was careful to obtain an easement over all walks, roads, and paved area (including the means of ingress and egress) in their leases of Buildings No. 25 and No. 27, First Trust completely ignored this essential factor when they bought the property, thus indicating they were not too concerned with permanent possession. On the other hand, the fact that subsequent to the lease with First Trust the petitioners *110 built Building No. 24 with a wall common to it and to Buildings Nos. 25 and 27 and in such a manner so that both its electrical system and its heating system were dependent in part upon Building No. 27 indicates that the petitioners not only were concerned with but intended to retain permanent possession of Building No. 27. Another indication of the intention of the parties is the provision that the petitioners pay all of the First Trust Company's expenses in the transaction including its attorneys' fees. Such provision is more usually found in a mortgage loan or financing transaction than in a sale arrangement. It is also interesting that First Trust, with the possible exception of the first payment, treated the transaction on its books in the same manner as a mortgage. Even as to the first payment, we believe the treatment was consistent with a loan or financing arrangement. The first payment was made on or about December 2, 1957, when the deed, party wall agreement and other documents were delivered. At this time the transaction was closed and obviously no interest was due then. The crediting of the entire first payment to principal was therefore entirely consistent with a mortgage *111 or financing arrangement. The loan having been made then, the first payment of necessity was credited to principal. Here petitioners owned the real estate for many years; it was a small portion of a large tract, the balance of which they retained; they entered into an agreement with 3M to Build Building No. 27 to 3M's specifications and to lease it to 3M for a 10-year term with options to renew; they then commenced construction of the building and before its completion entered into the arrangement with First Trust to transfer the property and lease it back for ten years under such terms that they in effect continued exactly as if they remained the owners, with the option to assure return of title. Consequently, the petitioners were able to finance their new venture, reap the profits of the 3M lease and retain complete control of the property, other than for a temporary relinquishment of title. On an examination of the whole record we hold that the transaction was a financing arrangement, in substance a mortgage. With every payment the petitioners were acquiring an equity in the property and consequently are not entitled to any deduction for rent under section 162(a)(3). Consistent *112 with this view, we also hold that the petitioners are entitled to a deduction for interest paid, under section 163 of the 1954 Code. The interest should be spread at an equal rate over all of the payments, including the option price, since consistency requires that the option price be considered an integral part of the financing arrangement, and consequently it should be treated as the final payment. This decision is limited to the years at issue and does not reach the question of how to treat the option in the event it is not exercised. We have found that the useful life of Building No. 25 is 25 years and that of Building No. 27 is 30 years. We are impressed with the testimony of the petitioners' witnesses as these findings indicate. They were familiar with the local situation in the Saint Paul area, local values and trends and they made a thorough examination and analysis of the properties. They were in comparative agreement as to the useful life of the buildings and their component parts. We have also taken into consideration the fact that the warehouses were essentially single-purpose buildings; that they were cheaply constructed and that substitute materials were used in Building *113 No. 25. See Kerr-Cochran, Inc., 30 T.C. 69 (1958); section 1.167(a)-1(b), Income Tax Regs.
The basis of Building No. 27 for purposes of depreciation is its cost. See section 167(f) and 1011 of the 1954 Code. The cost was $1,025,505.07, and this will not be increased by any payments to First Trust since we have found that they are simply part of the financing arrangement. The parties have conceded that the depreciation on Building No. 27 may be calculated on the basis of its component parts and under any of the conventional methods allowed by the Income Tax Regulations. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Donald G. McNeely and Marjorie R. McNeely, Docket No. 92031; Harry G. McNeely, Jr. and Josephine M. McNeely, Docket No. 92032; William E. Frenzel and Ruth P. Frenzel, Docket No. 92033; Peter M. Frenzel, Docket No. 92037; Donald G. McNeely and Marjorie R. McNeely, Docket No. 92846; Paul W. Frenzel and Paula S. Frenzel, Docket No. 92847; Peter M. Frenzel, Docket No. 92848; William E. Frenzel and Ruth P. Frenzel, Docket No. 92849; and Harry G. McNeely, Jr. and Josephine M. McNeely, Docket No. 92850.↩
2. SEC. 1962. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩