**AMERICAN REALTY TRUST, appellee,**

v.

**UNITED STATES of America,
Appellant.**

**No. 73-2488.**

United States Court of Appeals,
Fourth Circuit.

Argued April 3, 1974.

Decided June 24, 1974.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Jonathan Cohen, John A. Townsend, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel; Brian P. Gettings, U. S. Atty., for appellant.

Boothe, Prichard & Dudley, Fairfax, Va., by Arthur P. Scibelli and Carrington Williams, Fairfax, Va., for appellee.

Before HAYNSWORTH, Chief Judge, and BUTZNER and ADAMS * Circuit Judges.

ADAMS, Circuit Judge.

After the sale and lease-back of a particular piece of commercial real estate, who, as between the seller-lessee and the buyer-lessor, is entitled to claim, for federal tax purposes, a depreciation deduction for the property? That is the key issue in this case, and it arises from the attempt by a real estate investment trust to take a depreciation deduction on an apartment house that it purchased and then leased back to the seller.

The taxpayer, American Realty Trust ("ART"), is a real estate investment trust, that since its inception in 1961 has sought the favorable tax treatment afforded such trusts by the Internal Revenue Code.[1] To qualify for such treatment under the Code, each trust must pay out at least 90 per cent of its taxable income each taxable year in dividends to its shareholders.[2] If the trust

---

* United States Circuit Judge for the Third Circuit, sitting by designation.

1. *See* 26 U.S.C. §§ 856–858.

2. 26 U.S.C. § 857(a)(1). Specifically, the Internal Revenue Code provides that the trust must pay out 90 per cent of its "real estate

qualifies, such income is taxed only to the shareholders.[3] Failure to qualify results in the dividend income being subjected to taxation twice—once to the real estate investment trust, and once to its shareholders as dividends.[4]

On January 29, 1965, ART entered into an agreement with one Harry Helmsley, a real estate entrepreneur. By the terms of the agreement, Helmsley conveyed to ART for seven million dollars a resort property in Palm Beach, Florida, called the Palm Beach Towers.

The sale price, seven million dollars, was composed of $2,500,000. in cash, and the balance by ART's taking the property subject to a mortgage of $4,500,000. The agreement provided that if the mortgage were reduced to less than $4,500,000. by the date of closing, ART, the buyer, would still make cash payments totaling $2,500,000.

ART agreed to lease the property on a "net lease" basis to Palm Beach Towers, Inc., Helmsley's wholly-owned corporation, with certain provisions under the lease to be undertaken or guaranteed by Helmsley personally. At the closing, ART was to provide Helmsley with a written option to repurchase the property.

On February 8, 1965, ART and Palm Beach Towers, Inc. entered into a lease of the Palm Beach property with ART as lessor and Towers as lessee. The lengthy and complex lease contained the following pertinent provisions:

(1) The rental term was to run until January 31, 1986, or 21 years, with two successive twenty-five year renewal options.

(2) A net rental averaging $645,000. per year was stipulated. Related provisions insured that every cost would be borne by the tenant.

These costs included, *inter alia,* all operating expenses, taxes, levies, insurance, and repairs. In addition, Helmsley was to bear the cost of some capital improvements made to the property.

(3) The rental rate was to be reduced by 50 per cent of any reduction in the amount paid annually on the mortgage.

(4) In the event the mortgage was increased, the tenant, Palm Beach Towers, Inc., would be entitled to 50 per cent of the addition.

(5) Any condemnation award for the property was to be applied in the following manner: (a) to the mortgagee to the extent of the outstanding principal balance; (b) to the landlord up to $2,525,000; (c) to the tenant up to the value of its leasehold estate; and (d) the remainder to be shared by the landlord (60 per cent) and the tenant (40 per cent).

(6) If less than all the property were taken by condemnation, the net rent was to be reduced by an amount equal to 10½ per cent of any sum received by the landlord and not applied to the reduction of the mortgage principal.

(7) The landlord, ART, was to consent to any assignment of the lease, except that it could withhold its consent if any transfer prior to February 1, 1971, were to a corporation or partnership in which Helmsley had less than a 25 per cent interest.

(8) The lease incorporated Helmsley's personal guarantee to meet the lease obligations through January 31, 1971, and bound Helmsley to own at least 25 per cent of the tenant organi-

---

investment trust taxable income," in order to qualify for the tax advantage in question. *See* 26 U.S.C. § 857(b)(2).

**3.** *See* 26 U.S.C. § 857(b)(2)(C).

**4.** There is legislation presently before Congress that would meliorate the tax plight of a trust that fails, unintentionally and with "reasonable cause," to distribute 90 per cent of its taxable income in dividends. *See* H.R. 11083. 93d Cong., 1st Sess. (1973).

zation, and personally to oversee the operation of the property. [5]

Executed contemporaneously with the lease was a document styled "Option Agreement," between Helmsley and ART, under which Helmsley was granted an option to repurchase the Palm Beach property. The option was to be exercisable only at one of the following times, and at the indicated price:

August, 1969—$6,560,000.
August, 1970— 6,440,000.
August, 1971— 6,320,000.
August, 1972— 6,190,000.

The option price was to be paid by Helmsley's assuming the mortgage as it existed at the time of exercise of the option, and by his paying the balance of the purchase price in cash.

On September 17, 1971, Helmsley assigned the option contract to his "Subchapter S" corporation, which proceeded to exercise the option. Helmsley testified that he was motivated to exercise the option by the sudden availability of "wrap around" [6] financing, which enabled him, through his corporation, to acquire title with little cash outlay of his own.

ART elected to be taxed as a real estate investment trust for fiscal year 1968 under sections 856 through 858 of the Code.[7] In its computation of its taxable income for that year, ART included in its gross income the rental payments from Palm Beach Towers, and took a large depreciation deduction for the Palm Beach property as well as a deduction for the interest payments it had made on the mortgage. ART computed

its "overall" 1968 income on the same basis, and distributed to its shareholders 90 per cent of its computed "real estate investment trust taxable income," so as to qualify for favorable tax treatment under the Code.

Upon audit of ART's 1968 federal income tax return, the Commissioner determined that the "sale and lease-back" arrangement between ART and Helmsley did not result in a transfer of "true" ownership of Palm Beach Towers to ART, but rather constituted a "secured-lending arrangement" by which Helmsley retained ownership of the property, while ART acquired, in effect, only a security interest in it. The whole transaction, maintained the Commissioner, was thus in the nature of a "loan" by ART to Helmsley, secured by the Palm Beach property.

Accordingly, the Commissioner denied ART any deduction for depreciation on the Palm Beach property, and characterized Helmsley's rental payments as "interest" on the ART loan. The disallowance of the depreciation deduction resulted in a substantial increase in ART's taxable income and, consequently, caused the amount distributed to its shareholders to be less than the requisite 90 per cent of ART's taxable income.[8] The Commissioner therefore denied ART its status as a qualifying real estate investment trust under the Code, and levied an increased tax.

ART paid the tax, with interest, and filed a claim for a refund. Upon administrative denial of its claim, ART brought suit in the district court for the refund. The jury, by "special verdict," [9]

---

5. Helmsley could terminate his obligation as guarantor of the lease by posting a $200,000. bond.

6. This sort of financing arrangement allows a borrower to give what is essentially a second mortgage on a property, but have it treated as a first mortgage.

7. 26 U.S.C. §§ 856–858.

8. Disallowance of the depreciation deduction caused ART's taxable income to increase. ART had distributed 90 per cent of taxable income calculated with the deduction. The

amount thus distributed was, of course, less than 90 per cent of taxable income calculated *without* the depreciation deduction. The difference between the dividend distribution and the amount ART would have had to distribute under the Commissioner's computation of its taxable income was about $19,000. Art's failure to pay out this amount resulted in a claimed increased tax liability of $279,642.66, exclusive of interest.

9. A single factual question was posed to the jury, the answer to which necessarily consti-

found the ART–Helmsley transaction to constitute a "good faith" purchase and lease-back by ART, and not merely a "financial arrangement." Based on that verdict, the trial court entered a judgment directing the government to pay ART a refund. The government has appealed.

## I.

■ In this Court, the government again raises the contention, developed at trial, that the ART–Helmsley transaction was "in substance a secured loan transaction in which the taxpayer loaned money to the nominal 'seller' [Helmsley]." The second step in the government's argument is, of course, that ART was not entitled to claim depreciation on the Palm Beach Towers, inasmuch as ART was not the "true" owner of the property.[10]

In oral argument before this Court, government counsel suggested that the proper characterization of the "substance" of the transaction was essentially a factual matter. This suggestion is entirely consonant with the manner in which the government litigated the case in the district court. For example, in its trial brief, the government proposed that the "sole dispute" between the parties could be resolved by tendering the following factual question to the jury:

"Has plaintiff, American Realty Trust, proven by a preponderance of the evidence that the Palm Beach Towers transaction was a bona fide sale and leaseback, and not a financing arrangement?"

The issue was put to the jury in practically the form proposed by the government[11] and a verdict favorable to ART was returned.

tuted the complete verdict. *See* discussion, *infra.*

10. It is settled that the right to claim depreciation for tax purposes does not necessarily follow the legal title to property, but rather flows to him who "bear[s] the burden of exhaustion of [the] capital investment." Helvering v. Lazarus & Co., 308 U.S. 252, 254, 60 S.Ct. 209, 210, 84 L.Ed. 226 (1939).

11. The request for a jury trial was made by the government.
The trial judge instructed the jury in part as follows:
"The issue in this case is whether the transaction between the plaintiff, American Realty Trust, and Helmsley was a good faith purchase and leaseback or was it a financial arrangement.
"By financial arrangement is meant this. Was this an arrangement which, regardless of its form, had as its purpose and effect the ownership of the property by Helmsley with American Realty Trust merely lending money secured by the property. To put it another way—in substance, as opposed to just form—was American Realty Trust the real owner of the property which it leased to Helmsley or was Helmsley the real owner of the property on which American Realty Trust held in effect the mortgage.
"In making this determination you should consider the following indicia of ownership—I mean, earmarks of ownership—no one of which is controlling:
1. Who had the actual command or control over the property?

2. What economic results were intended by the parties; and what were those economic results?
3. Whether American Realty Trust paid a price for the property which was equal to its fair value? That is, $7 million—and insofar as this tends that $7 million was not the value of the property.
4. Who was to bear the various expenses on the property including repairs, taxes, insurance, taintenance, and whether it was normal for that party to bear them.
5. Who was to bear the risk of loss in event of destruction of the property?
6. The length of the lease, and the length of the lease with reference to the useful life of the property.
7. The option to repurchase—and its terms, including the amount to be paid if the option was exercised.
8. Who would get the benefits of any appreciation that occurred in the value of the property?
9. Did the payments made by Helmsley resemble rent or did they resemble payments on a loan?
10. For whom, Helmsley or American Realty Trust, was the equity by the amortization of the mortgage being built up—that is, who would get this equity in event of repurchase by Helmsley?
"You should bear in mind in considering this issue and these factors, that there may be explanations of these factors, that I have just outlined that are as fully consistent with a good faith purchase and leaseback as they are with a loan. There is nothing inherently

■■ So viewed, it would seem that our primary function on this appeal is to determine whether there was sufficient evidence to support the jury's verdict. We emphasize that appellate review of a jury verdict presents no occasion for the reviewing court to sift and weigh competing factual assertions, to draw its own inferences from contradictory evidence, or to choose between the more persuasive of two plausible but contradictory inferences. It is the jury which "weighs the contradictory evidence and inferences" and draws "the ultimate conclusion as to the facts."[12] Nor would the district court have been correct in granting the government's motions for directed verdict or for a judgment *non obstante veredicto,* unless the proofs at trial that this was not a *bona fide* sale and lease-back had been "so clear that reasonable men could reach no other [conclusion]." [13]

Applying these standards, we are disinclined to disturb the jury's verdict. There was extensive testimony to the effect that the Helmsley-ART deal was *not* merely a tax avoidance device, that commercial considerations underlay it, and that the parties intended that the ownership of the Palm Beach property would pass to ART. In short, there was evidence that the transaction "was a good faith purchase and lease-back" and not a mere "financial arrangement."[14] Given the presence in the record of such evidence, we cannot say the jury's verdict was clearly erroneous. Neither can we say that the record so overwhelmingly supported the government's position that a directed verdict or a judgment n. o. v. should have issued.

## II.

The Government presses upon us what amounts to a second contention, namely that ART's right to claim depreciation on the Palm Beach property is essentially a question of law, not of fact, and that therefore this Court may consider the matter *de novo,* as it were. Stated otherwise, the government maintains that the question whether a sale-and-lease-back is *bona fide,* and whether the buyer-lessor can therefore claim depreciation, is a legal one. Quite obviously, the government asks us to decide this "legal" issue adversely to ART.

The characterization of the question in issue as "legal," not factual, admittedly has a basis in decisional law. In Helvering v. Lazarus & Co.,[15] the Supreme Court suggested that the determination of the *bona fides* of a sale-and-lease-back transaction involves, ultimately, a legal conclusion, albeit one grounded in underlying findings of fact.[16] Thus, notwithstanding that the government has, until this appeal, consistently treated the pivotal issue in this case as a

suspect in a purchase and leaseback, for example, and all leases to any tenant relinquish a certain amount of control and command of the property; also, the terms of the lease and option may as well have been the result of hard bargaining during negotiations as they were evidence of intentions to create a financing arrangement or financing arrangement results.

"You are instructed that the determination of whether the transaction between the American Realty Trust and Harry Helmsley was a purchase of American Realty Trust and a leaseback to Helmsley or whether it was a loan to Helmsley by American Realty Trust and a mortgage put on by Helmsley in favor of American Realty Trust turns in part on the intention of the parties."

The government made no objection to the charge as given, either at trial or on this appeal.

12. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700–701, 82 S.Ct. 1404, 1411, 8 L.Ed.2d 777 (1962) ; Tennant v. Peoria & P.U.R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944).

13. Burcham v. J. P. Stevens & Co., 209 F.2d 35, 38 (4th Cir. 1954). The government, in moving for a directed verdict before retirement of the jury, preserved the opportunity to move for a judgment n. o. v.

14. *See* Note 11 *supra.*

15. 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939).

16. *Id.* at 254, 255, 60 S.Ct. 207 ; *Cf.* Commissioner v. Court Holding Co., 324 U.S. 331, 333, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Union Planters Nat'l Bank v. United States, 426 F.2d 115, 117 (6th Cir. 1970).

factual one, we shall consider whether, as a matter of law, the ART–Helmsley deal was a *bona fide* sale-and-lease-back, or was "actually a loan secured by the property involved." [17]

The Government urges upon us a congery of arguments in support of its position. It contends that "Helmsley . . . retained all the significant burdens and benefits of ownership of the property," that Helmsley was "economically compelled" to exercise his repurchase option, that the "rental payments" under the "lease" in fact constituted interest payments at a rate of 10½ per cent, and that these, together with other factors, indicated that the transaction was in "substance" a loan to Helmsley secured by the Palm Beach property. Additionally, the government maintains that the facts of this case do not differ materially from those in *Lazarus, supra,* and that we are thus bound by precedent to conclude that the sale-and-lease-back here was not *bona fide.*

We are not persuaded that the ART–Helmsley transaction must necessarily be characterized as a sham, as less than *bona fide,* or as, "in substance," a secured loan. There was considerable evidence in the record to the effect that the intent of the parties, acting in complete good faith, was to undertake a sale to ART with a subsequent lease-back to Helmsley. There was testimony tending to show that Helmsley decided to exercise his option because of the sudden availability of "wrap-around" financing, not because there was any "economic compulsion" to repurchase inherent in the deal with ART. Moreover, there was testimony that the agreed upon purchase price—$7,000,000—was "fair," and not an unduly low one as the government asserts. These factors appear to us to provide sufficient basis for the conclusion that the sale-and-lease-back was, in substance, a *bona fide* transaction. This is not to suggest, of course, that we believe that tax considerations played no part whatsoever in the ·planning of the deal. Merely because tax planning may have preceded a transaction, or because tax savings have flowed from it, we are not constrained to characterize the entire event as primarily, or even substantially, a tax avoidance device.[18]

The details of the ART–Helmsley deal, too, are sufficiently distinguishable from those in *Lazarus* that the dictates of that case are not controlling here. Helmsley's lease, for example, was for an initial term of only 21 years. The lease in *Lazarus* ran for 99 years. In addition, there were particularized findings of fact in the latter case that established the intent of the parties to clothe a loan in the superficial garb of a sale-and-lease-back.[19] There were no such findings here, and thus there is no occasion to apply the *Lazarus* rule in the context of this litigation.

Accordingly, the judgment of the district court will be affirmed.[20]

---

17. *Lazarus, supra,* 308 U.S. at 255, 60 S.Ct. at 210.

18. In this regard, the district court instructed the jury that:
   "A taxpayer is entitled to conduct his affairs so as to minimize his tax liability, provided he does not make a transaction appear to be something it is not simply to reduce or eliminate a tax liability."

We find no fault with this statement. *Cf. Court Holding Co., supra,* 324 U.S. at 334, 65 S.Ct. 707.

19. In *Lazarus* the Supreme Court noted that the Board of Tax Appeals had *found* "that the instrument under which the taxpayer purported to convey legal ownership to the trustee bank was in reality given and accepted as no more than security for a loan on the property; the 'rent' stipulated in the . . . 'lease' back was intended as a promise to pay an agreed five per cent interest on the loan; and the 'depreciation fund' required by the 'lease' was intended as an amortization fund . . . ." 308 U.S. at 254, 60 S.Ct. at 210.

20. ART has filed with this Court a motion to dismiss the government's appeal, grounded in the government's alleged failure to perfect the appeal by supplying a complete record. Because of our disposition of the merits of the case, we find it unnecessary to dispose of ART's motion.