**FRANK LYON COMPANY, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 75–1615.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1976.

Decided May 26, 1976.

As Modified on Denial of Rehearing and Rehearing En Banc Aug. 6, 1976.

Gary R. Allen, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant; Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, John A. Dudeck, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., and Wilbur H. Dillahunty, U. S. Atty., Little Rock, Ark., on brief.

C. J. Giroir, Rose, Nash, Williamson, Carroll, Clay & Giroir, Little Rock, Ark., for appellee; J. Gaston Williamson and Rose, Nash, Williamson, Carroll, Clay & Giroir, Little Rock, Ark., on brief.

Before BRIGHT and HENLEY, Circuit Judges, and REGAN,* District Judge.

BRIGHT, Circuit Judge.

This income tax controversy arises from a series of complex documents which purport to effect a sale of a bank building (not including the underlying land) by a bank to taxpayer, Frank Lyon Company, and a 65-year leaseback with options to purchase the building by the bank. The question presented is whether these transactions vested taxpayer with ownership of the building for tax purposes so as to entitle taxpayer to deduct from its income the tax shelter benefits of depreciation of the building and interest paid on the building mortgage loan. The Commissioner of Internal Revenue ruled that taxpayer did not possess ownership of the building for tax purposes and denied taxpayer these tax advantages. Taxpayer paid the deficiency and successfully sued for a refund in the United States District Court for the Eastern District of Arkansas. The Government thereafter brought this appeal. We reverse, and sustain the Government's position.

Taxpayer acquired its interest in the building in question from the Worthen Bank and Trust Company of Little Rock, Arkansas (Worthen). In 1965, Worthen entered negotiations for the purchase of land in downtown Little Rock on which to construct a new bank building. When such land was purchased, Worthen drew up plans for the new building and entered into construction contracts.

Worthen initially intended to finance the construction itself and to retain ownership of the building. However, federal and state banking regulations forbade Worthen to carry such an expensive building as an asset on its own books. Worthen thereupon decided to adopt a sale-leaseback arrangement using a newly-formed, wholly-owned corporate subsidiary to hold title to the building. However, Worthen learned that debt financing for such a subsidiary could not be arranged.

In 1967, Worthen informed banking authorities that it had decided upon a sale-leaseback arrangement with an independent investor. This approach satisfied the applicable state and federal banking regulatory agencies. Worthen then obtained a verbal commitment from First National City Bank of New York (FNCB) for interim construction financing. A similar commitment for long-term financing of the building was obtained from New York Life Insurance Company. The long-term financing was conditioned upon approval by New York Life of the party nominated by Worthen to hold title to the building.

Worthen then commenced arm-length negotiations with several investors. Taxpayer Frank Lyon Company learned of these negotiations and informed Worthen of its interest. Frank Lyon, chairman of the board of taxpayer company, served on Worthen's board of directors and Frank Lyon Company does substantial business with Worthen.

* JOHN K. REGAN, United States District Judge, Eastern District of Missouri, sitting by designation.

Worthen's proposal to the investors specified that construction would cost approximately $7,500,000. After some negotiation, Worthen narrowed the field of potential investors down to taxpayer and one other party. Worthen then proposed that the investor selected should supply an ownership "equity" of $500,000, which would bear "interest" at the rate of six percent per year. The remaining financing would be supplied to the investor by the prearranged mortgage from New York Life at the rate of six and three-quarters percent, payable in 25 years. Worthen would lease back the building from the investor under the conditions discussed below and would retain an option to repurchase at the end of the 11th, 15th, 20th, and 25th years at specific amounts, plus an assumption of the New York Life mortgage. If Worthen did not purchase the building during the 25-year primary term, it would have eight additional options to extend the lease, each for a five-year period (40 years total). Worthen would agree to execute a 75-year ground lease for the land under the building (ownership of which Worthen retained) to the investor, and to subject the adjacent parking facility (of which Worthen also retained ownership) and certain building furnishings and equipment to the New York Life mortgage. Worthen retained the rights to the investment tax credit and sales tax savings generated by the building project.

Taxpayer was selected by Worthen as the investor when it agreed to accept these terms and additionally agreed to reduce Worthen's building lease payments by $21,000 per year for the first five years. It later developed that New York Life would not accept assignment of a lease incorporating this rental reduction. Worthen and taxpayer then entered a lease at the rental originally proposed but by separate agreement provided for some additional benefits to accrue to Worthen in an independent transaction.[1] Thereafter, taxpayer, Worthen, First National City Bank, and New York Life Insurance Company entered into various leases, assignments, notes, and agreements effective May 1968 and December 1969, whereby Worthen "sold" its building as it was constructed to taxpayer and Worthen then "leased back" the building from the taxpayer.[2]

The ultimate sale price of the Worthen building to taxpayer amounted to $7,640,000, of which New York Life furnished all but $500,000 through its mortgage. This mortgage was secured by a first deed of trust executed by taxpayer and Worthen which conveyed to New York Life title to the land, building, and a parking facility. As additional security, taxpayer, assigned to New York Life its interest in the building lease and ground lease. By separate agreement with New York Life, Worthen consented to this assignment and agreed not to terminate the building lease as long as the mortgage remained outstanding.

Worthen's annual rent for the first 25 years of the building lease represents the

1. When New York Life refused to accept assignment of a lease with such a provision, as a substitute taxpayer agreed in August of 1969 to pay a higher than normal rate of interest on a $500,000 loan obtained from Worthen which taxpayer used to buy out the shareholders of a Coca Cola Company. Taxpayer paid an interest rate three percent greater than its usual borrowing rate from Worthen. This one-year note has been renewed from time to time up to the date of trial without reduction of the principal.

2. Worthen contracted for the building and supervised its construction. As construction progressed, Worthen transferred its interest in the building to taxpayer piecemeal so that the building never appeared as an asset on Worthen's books. The construction cost was paid by FNCB, the interim mortgagee, pursuant to an interim financing agreement between FNCB, Worthen, and taxpayer, in which Worthen conveyed title to the building, land, and banking facility to the lender and taxpayer assigned its interest in the ground lease and building lease to FNCB as additional security for the loan. Worthen also guaranteed that the building and parking facility would be fully completed, free from liens, by December 1, 1969, and that if the construction loan had not been paid (through closing of the mortgage with New York Life) Worthen and taxpayer would enter into a new building lease on terms satisfactory to FNCB.

exact amount necessary to fully amortize the 25-year, $7,140,000 New York Life mortgage.[3] Should Worthen exercise its option to purchase during the primary term of 25 years, taxpayer would receive a net cash amount equal to its $500,000 "equity" investment plus six percent compounded interest. Should Worthen elect not to purchase the building and to continue paying rent for the potential additional 40-year life of the lease (eight extensions of five years), the rental payments provided will approach but not equal taxpayer's $500,000 investment compounded at a six percent rate.[4]

As we have already noted, Worthen retains an option to repurchase the building at the end of 11, 15, 20, and 25 years at the exact amount of taxpayer's investment of $500,000 in the transaction, compounded at six percent per annum, plus assumption of the unpaid balance of the New York Life mortgage. We observe in this connection that the first option period occurs after the first 11 years of the lease during which income tax savings to taxpayer from interest and depreciation will amount to about $1,500,000. Thereafter, taxpayer would reap no tax benefits from ownership. Increasing amounts of the rental received from Worthen and passed on to New York Life would apply to the principal of the mortgage, rather than to interest, and hence would be nondeductible. At the same time, allowable depreciation on the building would not equal the non-interest portion of the rent. The net result would be taxable income to taxpayer.

The various terms of the lease provide that essentially all costs, risks, and responsibilities rest with Worthen. For example, Worthen bears all repair and maintenance expense, all public utility charges, mechanics' liens, taxes and levies of every sort, and all insurance expenses, including property, liability, fire, war risk, and sprinkler and boiler damage. Worthen also must indemnify the lessor for any claim arising out of the operation of the building and repair any damage or destruction. By the terms of the lease, the rent is absolutely net to the taxpayer (and hence to New York Life) without allowance for any counterclaim, setoff, or defense by the lessee, and is to be paid without notice, demand, counterclaim, setoff, or defense lessee might otherwise assert.

Worthen's obligation to make payment of rent to taxpayer is not affected by any damage or destruction to the building. Interestingly, any condemnation or insurance proceeds resulting from total destruction apply in the following order: (1) to New York Life in an amount sufficient to fully prepay the mortgage; (2) the balance to taxpayer up to the amount provided as the purchase price in the termination table (amortizing taxpayer's $500,000 investment at six percent); and (3) any excess to Worthen. Worthen has the option to either replace the building or to purchase it in the event there is a partial condemnation or

---

3. The rental owed by taxpayer to Worthen for the ground lease during the 25-year primary term amounts to the nominal sum of $50 per year. All parties are agreed that ground rents constitute a "wash" item since greater ground rents would call for an increased building rental to be paid by Worthen. However, after the first 25 years, the ground rents sharply increase to $100,000 per year starting in 1994, $150,000 in 1999, $200,000 per year in 2004, and $250,000 for the next 25 years to 2034. At the same time, the building lease rentals inexplicably become approximately halved to $300,000 per year. The ground lease is for a term of approximately 10 years longer than the 65-year building lease. During this last 10 years, the annual ground rent is set at $10,000. Should Worthen continue to occupy the building during this period, a new building lease and rental would have to be negotiated with taxpayer.

4. As we have observed in note 3 *supra,* if the lease runs its full term, the taxpayer could negotiate a new lease for the building during the additional 10 years covered by the ground lease. Depending upon the rentals, the taxpayer could assure receipt of its original investment and the interest compounded thereon for the full 75-year period covered by the ground lease.

Taxpayer vehemently argues that Worthen will extend the lease to the full 65-year term. The Government argues that Worthen will exercise its purchase option.

total destruction on or after December 1, 1980.[5]

On taxpayer's corporate income tax return for 1969, taxpayer reported the payments by Worthen under the building lease as rental income, and claimed deductions for depreciation on the Worthen building, interest paid on the interim and permanent mortgage loans, and other expenses it had borne with respect to the construction of the building. Upon audit of the taxpayer's return for 1969, the Commissioner determined that for federal tax purposes the taxpayer was not the owner of the Worthen building, but that the real ownership in the building as a matter of economic substance was retained by Worthen. The Commissioner's notice of deficiency denied taxpayer's claimed deduction for depreciation, interest, and other expenses with respect to the construction of the building but eliminated the rental income reported by taxpayer for the lease of the building. Taxpayer thereafter paid the deficiency, filed a claim for refund, and upon its denial, brought the instant action. As previously noted, the district court granted relief.

Although the court made findings of fact, the essence of its holding is expressed in the court's unreported letter opinion of May 16, 1975, as follows:

> [T]he Court finds that it was the intention of the parties, as evidenced by their written agreements, read in the light of the attending facts and circumstances existing at the time the agreement was executed, that the transaction be exactly what the language and form of the transaction indicate, that is, a sale-leaseback with option to repurchase. This was both the "subjective" intent of the parties, and it is also the "objective" intent as expressed by the clear, unambiguous language of the written instruments involved. The Court also finds and concludes that, objectively, the transaction

was in substance, as well as in form, a sale-leaseback with option to repurchase.

The taxpayer emphasizes that the trial court's findings of intent resolve a question of fact and bind us on appeal unless "clearly erroneous." Taxpayer points to our prior ruling that

> where the true nature of payments made under a lease-purchase instrument is drawn into question in tax cases, it is necessary to ascertain what the parties intended. [*Western Contracting Corp. v. Commissioner*, 271 F.2d 694, 699 (8th Cir. 1959).]

Numerous other cases support the view that intent is an important consideration. *See American Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974); *Breece Veneer & Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956); *Benton v. Commissioner*, 197 F.2d 745 (5th Cir. 1952). The Government responds that the ultimate question of ownership of property as it affects taxability rests upon a substantially undisputed record and must be reviewed as a question of law. *See American Nat. Bank of Austin v. United States*, 421 F.2d 442, 451 (5th Cir.), *cert. denied*, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970); *Union Planters Nat. Bank of Memphis v. United States*, 426 F.2d 115 (6th Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

Both parties' positions are partially correct. It is our duty to ascertain the economic substance of transactions in order to determine their characterization for tax purposes. *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939). Since parties are generally free to dispose of property interests as they wish, the substance of a transaction usually derives from the parties' intent. Subject to certain policy considerations, the courts will respect the actual allocation of interests made by the parties even though it reduces or eliminates tax liability. *Helvering v. F.*

---

**5.** The bank also reserved a right (by way of a separate letter agreement) to purchase the building at fair market value in the event of insolvency of the taxpayer or if the ownership of taxpayer company changes to others from that of Frank Lyon, his heirs, or his current working associates.

& R. Lazarus & Co., supra; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

In major transactions, the intent of the parties is usually spelled out in written form. Where the documents embodying the transaction are clear and complete, the court is called upon to interpret the documents, and from their substance, to characterize the transaction for tax purposes as a matter of law. See American Nat. Bank v. United States, 421 F.2d 442 (5th Cir. 1969), cert. denied, 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46 (1970). However, where the documents are ambiguous or incomplete, the court must first ascertain the unexpressed subjective intent of the parties in order to properly interpret the agreement and thus disclose its substance. See and compare Helvering v. F. & R. Lazarus & Co., supra; Western Contracting Corp. v. Commissioner, supra; Benton v. Commissioner, supra.

The court's determination of the parties' unexpressed subjective intent is a finding of fact. This inquiry may be assisted by the labels such as "lease" or "sale" which the parties have used in describing the transaction, but other factors are also significant and sometimes controlling. However ascertained, this subjective intent is of importance only to the extent that it affects the actual allocation of interests, not in spite of that allocation. We made this clear in Western Contracting Corp. v. Commissioner, supra, where we said the following:

> If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is a contract of sale and not a lease no matter what they call it nor how they treat it on their books. [Id. at 699; quoting Oesterreich v. Commissioner, 226 F.2d 798, 809 (9th Cir. 1955).]

In this case the allocation of interests between parties is spelled out in undisputed written documents. Characterization of the transaction for tax purposes requires us to "reason and interpret" these documents.

American Nat. Bank v. United States, 421 F.2d 442, 451 (5th Cir. 1970). As the Fifth Circuit said, this "is the law obligation of the court as distinguished from its fact finding duties." Id., quoting United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969).

We examine the issue of ownership by examining the respective rights held by the parties. In the common law sense, property rights can be analogized to a bundle of sticks. Each stick represents an interest in the underlying res which is the object of property. Certain commonly occurring bundles have been given conventional "labels" such as "lease" or "license." Frequently, the express agreement of the parties to a transaction will not specify the allocation of each stick. In such a case, the fact that the parties choose a particular label such as "lease" to describe the transaction may be a reliable guide to the allocation of sticks intended, although other indications of intent may modify or even supersede the labels employed. The determination of who got which bundle of sticks may require a determination of subjective intent and thus a preliminary finding of fact. However, except to the extent that subjective intent affects the allocation of the sticks, it is simply immaterial to the characterization of the transaction for tax purposes. Once the contents of each bundle is found, its tax characterization is strictly a question of law independently reviewable on appeal.

In this case the Government concedes that all parties intended to apply the label "sale-leaseback" to the transaction. However, the Government contends that this label has no real-world significance because every meaningful interest in the building was clearly possessed by Worthen by the agreement of the parties. In essence, the Government alleges that taxpayer totes an empty bundle and that the term "owner" for tax purposes cannot reasonably be attached to the empty wrapping taxpayer has retained.

Taxpayer responds that it cannot be assumed that Worthen will exercise its option to purchase and thereby reimburse taxpay-

er for its initial $500,000 investment plus accrued interest. Taxpayer further argues that if the purchase options are never exercised, it will eventually suffer the economic loss of depreciation and obsolescence of the building.

It is at this point that the ultimate issue is joined. The question for this court is whether, giving due deference to the underlying factual determinations of the district court, the taxpayer has demonstrated that it possesses sufficient genuine interests in the property to establish its legal right to be considered the owner for tax purposes. To resolve this question, we turn to the documents and undisputed testimony which establish the following allocation among the contracting parties of the benefits and burdens generated by the building.

1. Although mortgage monies and the half-million dollar contribution from the taxpayer covered the construction cost of the building, Worthen retained for itself the tax deduction for investment credit and sales taxes paid upon the materials which were purchased incident to the building's construction.

2. The lease agreements carefully circumscribed the usual right of an owner to obtain a profit from his investment by transferring his interest to a third party. Here, Worthen insisted upon a letter agreement from Frank Lyon Company giving Worthen the right to purchase the building in the event of a transfer of ownership of the Frank Lyon Company to anyone other than Mr. Lyon, his immediate heirs, and his current working associates in the taxpayer-company. Although the letter agreement provided for a negotiated price, any such price would obviously be related to Worthen's long-term lease (which generates no cash flow) and options to purchase the building after 11, 15, 20, or 25 years for $500,000, plus six percent compounded interest on that amount, and the unpaid balance of the underlying building mortgage to New York Life.

3. Any appreciation in value of the building realized as the result of its destruction or condemnation accrues to Worthen and not taxpayer.

4. The parties geared the purchase-option price to the unpaid balance on the mortgage plus taxpayer's initial investment plus interest accrued thereon at the limited rate of six percent per annum compounded. The parties took no account of likely appreciation in the value of the building nor inflationary factors, the latter an almost constant factor in economics for the past 40 years, nor otherwise provided for purchase at a future appraised valuation of the building. The rental payments over the first 25 years of the lease reduce the purchase price dollar for dollar. By contrast, the parties apparently recognized the likely appreciation in land values by almost doubling the ground rents upon satisfaction of the mortgage.

5. The final option price at the end of the initial 25-year term on November 30, 1995, in the sum of $2,145,935, reflects taxpayer's initial investment plus compounded interest thereon over these years. At that time the present value of the future net rentals for the next 40 years, discounted at six percent, would approximate the taxpayer's original half-million dollar investment plus the compounded interest accrued to that date. Although this amount does not fully amortize taxpayer's investment at six percent interest, the taxpayer is left with an additional ground lease for 10 years at only $10,000 per year with the right to negotiate with the bank or a new tenant for additional lease payments for the use of the building for the further period of 10 years. Thus, the taxpayer is given an opportunity to recoup his full investment at six percent interest prior to expiration of the ground lease.

6. The bank retained ultimate control over the disposition of the building through its various options for 65 years and its ownership thereafter of the land upon which the building rested.[6]

6. The Government contends that under Arkansas law, Worthen will achieve absolute ownership of the building at the expiration of the ground lease. *Williams v. Kirby School Dist.*

7. Finally, during the initial 25 years, the bank retained exclusive power to dispose of the building through its option privileges. During this period the taxpayer merely serves as a conduit for the lease payments to be transmitted to the mortgagee to pay the mortgage indebtedness. All responsibilities incident to the operation and ownership of the building otherwise rest with the bank. The only economic advantages inuring to taxpayer during this period are tax shelter benefits worth one and one-half million dollars in tax savings to the taxpayer during the first 11 years (if it should be considered owner), plus a nominal return on its investment of six percent compounded annually. The contract provides for no return related to ownership risk.

We do not doubt that the Worthen bank drove a hard bargain. It suffered no significant economic detriment by allegedly not owning the building since it asserted the right to deduct lease payments from current income. Nor did the terms of the lease deprive it of any significant benefit of ownership. However, the lease did satisfy the technical requirements of the banking regulations. By contrast, the taxpayer seeks to be considered as the owner for the sole purpose of reaping a benefit from the tax laws of the United States which allow an owner of property to deduct both depreciation of an asset and interest payments upon the purchase mortgage.

The overall nature of this transaction is closely akin to that in *Helvering v. F. & R. Lazarus & Co., supra.* There the taxpayer was the seller-lessee, occupying essentially the same position as Worthen in the present case. The taxpayer had assigned title to

two properties and a 99-year lease to a third to a bank and at the same time had leased the properties back for 99 years with an option to renew the lease and to purchase the properties. The Supreme Court affirmed the judgment of the tax court which found that the taxpayer was the real owner of the properties. The Court characterized the bank's interest as an owner-lessor as essentially that of a mortgagee. It held that "[i]n the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Id.* 308 U.S. at 255, 60 S.Ct. at 210, 84 L.Ed.at 230. Nothing in the Court's opinion places any emphasis on the parties' desired characterization of the transaction for tax purposes.

The Government also points to the tax treatment afforded the taxpayers in *Commissioner v. H. F. Neighbors R. Co.*, 81 F.2d 173 (6th Cir. 1936), and *Frito-Lay, Inc. v. United States*, 209 F.Supp. 886 (N.D.Ga. 1962). Taxpayer here attempts to distinguish those cases factually and takes comfort in their language which places some emphasis upon the parties' intent. However, the intent found by the courts in those cases accorded with and contributed to the economic substance of the transactions. For example, in *Frito-Lay*, the court expressly stated that the intent of the parties was a "guide" to the true nature of the transaction, 209 F.Supp. at 891, not a component thereof.

In this case, as we have already held, the asserted "intent" to effect a sale-leaseback for tax purposes is not a guide to the economic substance of the transaction, but instead appears to be wholly unrelated to the

No. 32, 207 Ark. 458, 181 S.W.2d 488, 490 (1944); *Wilson v. Davis*, 202 Ark. 827, 153 S.W.2d 171 (1941). Taxpayer cites an 1878 case, *Stirman v. Cravens*, 33 Ark. 376 (1878), for the proposition that title to a building does not pass to the owner of the land upon the expiration of the lease unless the lease so provides. Worthen argues that if the parties cannot agree upon a subsequent lease or repurchase of the property between themselves, an Arkansas court of equity will order the sale of

the land and building together and divide the proceeds in proportion to the respective value of the land and building. We need not resolve this issue except to note that the retention of the land reserved to Worthen substantial control over the ultimate disposition of the building should the bank forego its option privileges. Taxpayer's dubious claim to some form of equitable adjustment 75 years in the future does not substantially alter this conclusion.

actual allocation of interests. Taxpayer's reliance upon *American Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974), is misplaced. The arrangement there was not nearly so thin and transparent as the present transaction.

In sum, the benefits, risks, and burdens which taxpayer has incurred with respect to the Worthen building are simply too insubstantial to establish a claim to the status of owner for tax purposes. Taxpayer's claim to a depreciation allowance as owner of the Worthen building must be disallowed.

The interest deduction here also turns upon the ownership of the building. The record is clear that the real security for the mortgage is the building and the party with the real interest in maintaining the mortgage payments is Worthen. In effect, we sustain the Government's position that taxpayer served as a mere conduit for the mortgage payments made by Worthen to New York Life. The Commissioner properly did not charge taxpayer with rental income in the receipt and transmission of these funds.

In closing, we note what our opinion does not do. First, what we have said relates only to the tax status of the Frank Lyon Company. Worthen is not a party to this appeal. Our opinion in no way affects Worthen's relationship to the Worthen building, as recognized by federal and state banking regulations.

Second, our opinion should not be read as a general condemnation of sale-leaseback arrangements. They are an accepted and useful means of controlling business property. As taxpayer argues, many of the features of the lease in this case have been held not to terminate tax ownership when viewed independently. The vice of the present lease is that all of these features have been employed in the same transaction with the cumulative effect of depriving the taxpayer of any significant ownership interest.

Accordingly, we reverse the judgment of the district court and remand this case for the entry of an appropriate judgment not inconsistent with this opinion.