CAL-MAINE FOODS, INC., SUCCESSOR TO ADAMS EGG FARMS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent CAL-MAINE FOODS, INC., SUCCESSOR TO ADAMS FOODS, INC., (FORMERLY SIMPSON COUNTY HATCHERY, INC.) Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cal-Maine Foods, Inc. v. Commissioner
Docket Nos. 7092-74, 7093-74.
United States Tax Court
T.C. Memo 1977-89; 1977 Tax Ct. Memo LEXIS 352; 36 T.C.M. (CCH) 383; T.C.M. (RIA) 770089; March 30, 1977, Filed *352 Farms entered into an agreement entitled "Agreement of Lease" providing for the construction by the lessor of specific improvements on a particular parcel of land and monthly payments by Farms based upon the lessor's total original cost. The agreement contained an option under which Farms was entitled to purchase the leased premises at the end of the primary term of the lease, or at the end of any extension thereof, for a specified percentage of the lessor's total original cost. The Commissioner determined that the monthly payments under the agreement constituted capital expenditures and thus were not allowable deductions. Held, the agreement constitutes neither a mere security device nor a conditional sales contract and, therefore, the monthly payments constitute deductible rental payments under sec. 162(a)(3), I.R.C. 1954. Hugh C. Montgomery, Jr., for the petitioner. Robert W. West, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in petitioner's Federal income taxes: Docket
Taxable Year Petitioner
Number
Ended
Deficiency
Cal-Maine Foods, Inc.,
7092-74
9/8/66
$ 3,124.00
Successor to Adams Egg
Farms, Inc.
Cal-Maine Foods, Inc.,
Successor to Adams Foods,
Inc. (Formerly Simpson
County Hatchery, Inc.)
7093-74
5/27/67
$36,304.77
Concessions having been made, the sole issue for decision is whether payments made by Adams Egg Farms, Inc., to Cargill, Inc., constitute rental payments within the meaning of section 162(a)(3), [1] Internal Revenue Code of 1954, or were in reality payments *354 for the purchase of property. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioner Cal-Maine Foods, Inc., a Delaware corporation, maintained its principal office in Jackson, Mississippi, at the time it filed its petitions in this proceeding. It is the successor to Adams Egg Farms, Inc., and Adams Foods, Inc. Adams Egg Farms, Inc. (hereinafter Farms) filed a Federal corporate income tax return for its taxable year beginning February 1, 1966 and ending January 31, 1967, with the District Director of Internal Revenue, Jackson, Mississippi. It subsequently filed an amended return for the taxable period ending September 8, 1966, the day prior to the acquisition of all of its stock by Adams Foods, Inc. (hereinafter Foods). A consolidated Federal income tax return was filed by Foods and Farms for the taxable period ending May 27, 1967, with the District Director of Internal Revenue, Jackson, Mississippi. Farms was organized under the laws of the State of Mississippi on January 31, 1961. *355 Ten shares of common stock, the original capitalization, were issued to Fred Adams, Jr. On February 21, 1963, Cargill, Inc. (hereinafter Cargill) acquired 51 percent of the outstanding capital stock of Farms. During Farms' taxable year ended September 8, 1966, Cargill owned 51 percent of the outstanding stock of both Foods and Farms, while Fred Adams, Jr., owned the remainder. On September 9, 1966, Foods purchased 51 percent of the outstanding stock of Farms from Cargill; on the same date the 51 percent interest in Foods owned by Cargill was acquired by Mr. Adams, who contributed his 49 percent interest in Farms to Foods on such date. As a result of the above transactions, Mr. Adams owned all of the stock of Foods, which owned all of the stock of Farms. The principal business activity of Farms is the production and sale of eggs. In 1963 and during the years in question, the commercial egg business was speculative, cyclical, and highly competitive. Since 1963, major egg producers have gone out of business as the result of bank-ruptcy or lack of working capital. Egg consumption per capita and the number of laying chickens in the United States have decreased. The Federal *356 income tax returns and balance sheets of Farms for the taxable years ended January 31, 1963, and January 31, 1964, reflect the following amount of assets, liabilities and taxable income: Taxable Year
Taxable Year
Ended 1/31/63
Ended 1/31/64
Total current assets
$321,661
$565,086
Total current liabilities
366,627
518,221
Net Working capital
$ - 0 -
$ 46,865
Total assets
$395,096
$676,606
Total liabilities
377,327
527,061
Stockholders' equity
$ 17,769
$149,545
Taxable income (loss)
$ 165
($124,423)
In 1962 Mr. Adams prepared a "Plan for Producing Commercial Eggs" which he believed would result in a substantial decrease in production costs and increase profits. The facility contemplated by the plan was unique for Mississippi and the southern part of the United States in that it represented a new and unproven concept in at least two respects: (1) chickens were kept closely confined on wire rather than allowed to run loose on litter, and (2) a large number of chickens were concentrated in one area. Previously, the majority of eggs produced throughout the South were under contract egg-production arrangements whereby hens were "farmed out" *357 to many independent farmers who provided the necessary buildings, equipment and care. The concentration of over 1,000,000 hens at one location, as proposed, was considered by many persons knowledgeable in the egg business to create a hazardous disease potential. The plan contemplated a lessor who would be willing to construct a specified egg production facility and lease it to Farms, for the financial condition of Farms would not have permitted it to construct the facility with borrowed funds. The plan was based on an estimated facility cost of $2,000,000, which facility would be leased to Farms at a rental of $12.50 per $1,000 of cost. There was no mention in the plan of an option to purchase the facility during or at the end of the lease term. After learning that Cargill had an investment department and might be interested in the plan, Mr. Adams began negotiations with Cargill over the construction and leasing of the facility. An agreement entitled "Agreement of Lease" was subsequently executed on March 16, 1963, by Cargill and Farms which provided for the construction and rental of the facilities envisioned in the proposed plan. The negotiations were devoted mainly to the *358 primary term of the lease and rental payments. Little thought was given by the parties to the inclusion in the lease of an option to purchase. The lease agreement required Cargill, the lessor, to acquire certain equipment and construct certain improvements on a particular parcel of land and to lease the land, equipment and improvements to Farms. The improvements and equipment consist of a complete facility of specialized buildings and equipment designed specifically for the brooding, growing and caring of laying chickens, including 16 brooder houses, 32 cage growing houses, 178 cage laying houses and an egg processing plant. The land on which the leased facility was constructed consists of approximately 1,080 acres, and the buildings are spread over essentially all of the land. At the time the lease was executed the buildings, improvements and equipment could not have been removed from the land economically. The term of the lease is divided into the following parts: (1) the preliminary term, the period of time beginning on March 16, 1963, and extending to the completion of the construction of improvements and the acquisition of equipment, and (2) the primary term, the period *359 of time beginning on the first day of the month following the termination of the preliminary term and continuing for 12 years. Certain equipment was acquired and certain improvements were constructed prior to the completion of the acquisition of all equipment and construction of all improvements. Pursuant to the second, third and fourth amendments to the Agreement of Lease, the primary term for the specific improvements and equipment listed in the respective amendments commenced. The date of the second amendment, which included the land, was July 8, 1964. By the fourth amendment to the Agreement of Lease, the parties agreed to terminate the primary term for the land and all improvements and equipment on October 31, 1976. The Agreement of Lease provides that rental payments during the primary term of the lease are to be based upon a monthly payment of $11.10 for each $1,000 of the "Lessor's total original cost." Cargill's total original cost for the land involved was $136,366 and its cost for the entire leased property was $2,505,251. Although rental payments under the lease agreement were not separately computed for the land, such payments attributable to the land were in the *360 amount of $1,513.66 per month or $18,163.92 per year based on the rental formula contained in the lease. Rental payments attributable to the cost of the land began on June 1, 1964, and totaled $225,535.34 over the entire primary term of the lease. Rental payments made prior to January 1, 1966, the date of the fourth amendment to the Agreement of Lease, were as follows: Amount Date
per Month
Total
6/1/64 to 1/1/66
$16,009.54
$304,181.26
2/1/65 to 1/1/66
8,393.24
92,325.64
$396,506.90
As provided in the fourth amendment to the Agreement of Lease, total rental payments under the monthly formula were $27,808.28 per month or $333,699.36 per year for the period beginning January 1, 1966 and ending September 1, 1976, with a final payment on October 1, 1976, of $20,617.30, for total rental payments of $3,607,885.40 during this period. Therefore, the total rental payments under the monthly formula equaled $4,004,392.30 ($3,607,885.40 + $396,506.90) during the primary term of the lease. In addition to the rentals described above based upon Cargill's total original cost, the Agreement of Lease also provided for the payment of rentals in an amount equal *361 to 10 percent of Farms' net profits before taxes during the preliminary and primary terms or during any extensions thereof. Under the Agreement of Lease, Farms is given the option to renew the lease at the expiration of the primary term for up to ten years on a year-by-year basis with yearly rentals based on decreasing percentages of Cargill's "total original cost." Rental payments under the renewal option would be as follows: Percentage of Year of
Lessor's Total
Amount
Amount Extension
Original Cost
per Year
per Month
1
5%
$125,262.55
$10,438.55
2
3%
75,157.53
6,263.13
3
2%
50,105.02
4,175.42
4 through 10
1%
25,052.51
2,087.71
Petitioner is given the option to purchase the leased premises at the end of the primary term, or at the end of any extension thereof, for 12 percent of Cargill's total original cost of $2,505,251, or $300,630.12. The option to purchase is not severable as to the various components of the leased premises and, therefore, cannot be exercised only as to improvements or only as to land. The lease agreement provides that during the term of the lease, or any extension thereof, all taxes, assessments and charges *362 are to be paid by Farms.In addition, it requires that any taxes payable by Cargill or its assigns by reason of sale or purchase of the leased premises be paid by Farms. Farms must also purchase and maintain a satisfactory comprehensive general liability insurance policy covering the premises and indemnify and save harmless Cargill from any claim resulting from injury or death to persons or damage to property occurring on such premises. Farms is required by the lease to purchase fire insurance in favor of Cargill. In the event that Farms elects to have any of the premises which have been destoryed or damaged by fire replaced or repaired, Cargill is required to pay the insurance proceeds to Farms in installments as the property is repaired or replaced. All costs of such repair or replacements in excess of insurance proceeds are to be paid by Farms, with any excess proceeds payable to Farms. Under the agreement the responsibility for repairing and maintaining the premises is placed upon Farms. Damage to or destruction of the premises does not relieve Farms of any obligation under the lease. Farms is required to replace any property damaged or destroyed by any casualty unless *363 it elects to pay Cargill or its assigns the following: * * * an amount equal to 1/144th of the "Lessor's total original cost" of the same multiplied by the number of months left to run in the twelve-year primary term of this Lease from the date of Lessee's payment hereunder, plus an amount equal to.0015 of the "Lessor's total original cost" of the same multiplied by the number of months left to run in the twelve-year primary term of this Lease from the date of Lessee's payment hereunder * * *.
In the event of such election, the rent for the property will abate accordingly and any salvage value or proceeds will belong to Farms. In the event that any portion of the premises is condemned during the primary term of the lease, the total monthly rental for the remaining premises will be reduced by an amount equal to the rental attributable to the condemned portion of the premises upon the payment of an amount computed in the same manner as if the property had been damaged or destroyed. After having made such a payment, Farms is entitled to receive all compensation awarded upon condemnation. The lease agreement prohibits the assignment of the lease or the leased premises without *364 prior written consent of the lessor. It further provides that the terms and conditions of the lease "have been fixed by the Lessor in anticipation of [its] being able to assign its interest * * * to a lending institution or to others, and/or sell the said leased premises, or part thereof * * * to a lending institution or to others * * *." Farms treated the payments made under the Agreement of Lease during the years in question as rental expense; Cargill treated the payments received from Farms as rental income and claimed depreciation on the improvements and equipment. The Commissioner, in his statutory notice of deficiency for the taxable years ending September 8, 1966 and May 27, 1967, determined that the payments under the lease attributable to the land during such years constituted capital expenditures under section 263 and were, therefore, not allowable deductions. OPINION The sole issue for decision is whether certain amounts paid by Farms under an "Agreement of Lease" constitute rental expense deductible under section 162(a)(3), Internal Revenue Code of 1954, or part of the sales price of the subject property. Petitioner contends that the agreement *365 is in substance as well as in form a lease with an option to purchase, thus entitling Farms to a deduction for all payments made thereunder. Respondent, on the other hand, maintains that the transaction is in substance a sale of the property by Cargill to Farms. In the alternative, respondent contends that the transaction was a mere financing arrangement whereby Cargill provided financing for Farms and used the Agreement of Lease as a form of security device. Although respondent's position is that all payments made under the agreement were for the purchase of the subject property, he capitalized only those amounts attributable to the land involved after concluding that the capitalization of payments attributable to the improvements and equipment would be offset by depreciation thereon. Section 162(a)(3) provides as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) IN GENERAL. --There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(3) rentals or other *366 payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. Therefore, the payments in question are deductible as rent only if at the time they were made Farms had not taken title to the property, was not taking title to the property, and had no equity in the property. The written agreement itself is in the form of a lease with an option to purchase. However, it is well settled that we are not bound by the form of the agreement or the characterization thereof by the parties. Even if the parties enter into an agreement which they believe to be a lease but which has all the characteristics of a sale, it will nevertheless be treated as a sale for tax purposes. Mills v. Commissioner,11 T.C. 25 (1948). Similarly, if the characteristics of the agreement are those of a financing arrangement, it will be so treated. Substance, rather than form, will be controlling in determining the tax effect of the transaction. *367 Bowen v. Commissioner,12 T.C. 446 (1949). The principle extending through the numerous cases in this area is that where the "lessee" as a result of "rental" payments acquires something of value in relation to the overall transaction, other than the mere use of property, he is building up an equity and the payments therefore do not come within the definition of rent. Haggard v. Commissioner,24 T.C. 1124 (1955), affd. 241 F.2d 288 (9th Cir. 1956); Chicago Stoker Corp. v. Commissioner,14 T.C. 441 (1950); Bowen v. Commissioner,supra;Mills v. Commissioner,supra;Frito-Lay, Inc. v. United States,209 F. Supp. 886 (N.D. Ga. 1962). On the other hand, if the parties actually intended to enter into a lease contract containing an option to purchase, then the lessee, up until the time he exercises his option to purchase, acquires no equity in the property. What he has paid until that time is rent and will be treated as such for tax purposes. Lester v. Commissioner,32 T.C. 711 (1959). *368 Whether an agreement, which in form is a lease, is in substance a conditional sales contract depends upon the intent of the parties as evidenced by the provisions of the agreement, read in light of the attending facts and circumstances existing at the time the agreement was executed. In ascertaining such intent, no single test, or any special combination of tests, [2] is absolutely determinative. Each case must be decided in light of its particular facts. Western Contracting Corp. v. Commissioner,271 F.2d 694 (8th Cir. 1959); Benton v. Commissioner,197 F.2d 745 (5th Cir. 1952); Haggard v. Commissioner,supra.
Petitioner relies upon the economic condition of Farms and the egg industry at the time of the execution of the contract and the absence of factors often contained in agreements found to constitute conditional sales contracts in maintaining that no sale was intended. Respondent points to the following terms and characteristics of the Agreement of Lease in support of his position that a sale of the property *369 by Cargill to Farms was intended: (1) the numerous burdens and responsibilities placed upon Farms by the lease, such as its duty to pay all taxes, assessments and charges, its obligation to make all repairs and maintain the premises, and the requirement that it purchase fire and liability insurance and save harmless the lessor from claims arising from accidents occurring on the premises; (2) the fact that it bears the full risk of loss in the event of casualty or condemnation; (3) the relationship between the size of the payments to be made during the primary term of the lease to those required during any extension thereof; (4) the fact that under one provision of the lease agreement Cargill would receive an amount equal to its cost plus interest at the rate of 8-1/2 percent per annum during the original primary term of the lease; and (5) the size of the option price in relation to the total to the total cost of the premises. In considering each of the above-mentioned characteristics of the agreement in our attempt to ascertain the true intent of the parties, we must be careful to view them in light of the facts and circumstances existing at the time of the execution of the agreement. *370 Respondent first emphasizes the fact that the lease agreement imposes numerous risks and responsibilities upon Farms usually associated with ownership which some courts have found to be an important consideration in determining the intent of the parties. See Robinson v. Elliot,262 F.2d 383, 385 (9th Cir. 1958). Indeed, the fact that the entire risk of loss in the event of casualty or condemnation is placed upon Farms might appear to raise a presumption of sale. See Taft v. Commissioner,27 B.T.A. 808 (1933). However, most cases in this area have generally found that "such terms, being the subject of negotiation, are mere surplusage in determining whether in fact a lease was intended." Northwest Acceptance Corp. v. Commissioner,58 T.C. 836, 850 (1972). When considered in light of Farms' poor financial condition, its inability to obtain adequate financing for the project, and Cargill's superior bargaining position at the time of the execution of the lease, it is hardly surprising that the risks and burdens were shifted to Farms to the *371 greatest extent possible. In addition, Mr. Adams, who negotiated the lease for Farms, testified that the payment of taxes and insurance by the lessee was a common provision in many leases to which he had been a party. Although we recognize that it is uncommon for a lease agreement to require the lessee to pay any taxes due by reason of the sale of the leased premises, we do not consider that this provision, by itself, indicates the parties intended a sale. The fact that the monthly payments made during the primary term of the lease are greater than those to be made in the event of an extension of the lease is also relied upon by respondent in support of his contention that the transaction constitutes a sale by Cargill to Farms. If payments are not uniform under a lease agreement, the failure of such payments to vary in accordance with changes in the rental value of the property may indicate that the parties intended a sale. Oesterreich v. Commissioner,226 F.2d 798, 803 (9th Cir. 1955). However, we are satisfied that in the instant case the provision for decreasing *372 payments after the primary term of the lease merely reflects the anticipated reduction in the rental value of the premises resulting from the depreciation of improvements and equipment. Respondent next points to the provision in the agreement providing for a monthly rental at the rate of $11.10 per $1,000 of Cargill's total original cost, which is approximately equal to the amount necessary to amortize $1,000 at 8-1/2 percent interest over 12 years. In Northwest Acceptance Corp. v. Commissioner,58 T.C. 836 (1972), wherein respondent likewise contended that the presence of such a factor indicates that the parties intended a sale, we stated: Finally, we are not persuaded by respondent's arguments that part of the rental payments represents interest, and the sum of the contracts' periodic payments and option price approximates the cost of the equipment to a buyer under a deferredpayment plan. The former argument is of little merit for the reason that it is no more than a play upon words. In the tax sense, the term "interest" is generally associated with the use of money. *373 Deputy v. du Pont, 308 U.S. 488 (1940). To the borrower it is the cost of such use and to the lender it is his profit. In business parlance, however, the term is a pervasive one and can mean several things including the profit derived by a seller on the outstanding balance of a purchase price or that part of a lessor's rental receipts which represents profit, viz, that portion of the rental payment over and above the sum required to be set aside for depreciation and management of the leased property. * * * [Emphasis added.] [58 T.C. at 849.] Furthermore, respondent seems to overlook the fact that this amount was not the sole consideration for the use of the property in question. In addition to monthly payments at the rate of $11.10 per $1,000 of Cargill's total original cost, the agreement provides for payments equal to 10 percent of Farms' net profits before taxes. Mr. Adams testified that payments were made under this provision during at least one-half of the years within the primary term of the lease. Therefore, the total payments made under the lease agreement during the primary term of the lease will not equal Cargill's original cost *374 plus a predetermined interest factor as contended by respondent. Respondent's final argument is that the size of the option price when compared to the total payments to be made over the primary term of the lease and Cargill's total original costs strongly indicates that the parties intended for Farms to become the owner of the property at the end of the primary term of the lease. The size of the option price is also relied upon by petitioner in support of his contention that the parties did not contemplate a sale. The economic relationship of the value of the property to the option price is an important factor to be considered in attempting to ascertain whether what is in form a lease is in effect a conditional sales contract. In applying this important test, courts have examined the size of the option price both in relation to the subject property's original cost and to its anticipated value at the time the option may be exercised. Benton v. Commissioner,197 F.2d 745 (5th Cir. 1952); Northwest Acceptance Corp. v.Commissioner,supra;Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), *375 affd. 241 F.2d 288 (9th Cir. 1956); Holeproof Hosiery Co. v. Commissioner,11 B.T.A. 547 (1928). Whether the option price is compared to the original cost of the property or to its anticipated value at the end of the primary term of the lease, it cannot be considered so insubstantial to raise a presumption of sale, when considered in light of the useful life of the property, Farms' economic condition at the time of the execution of the lease, and the great risks involved. Under the terms of the lease agreement, Farms is entitled to purchase the entire premises for 12 percent of Cargill's total original cost of $2,505,251, or $300,630.12. We believe that such relationship is similar to that existing under the facts of Northwest Acceptance Corp. v. Commissioner,supra at 847-848, wherein the Court stated: Here, where the option prices range from 10 percent to over 50 percent of the original cost of the equipment, there is certainly more than a mere nominal option price in the contracts, and we cannot find that the purpose of the options was to give the lessee an equity in the equipment or to make the ultimate purchase of the *376 machine by the lessee an absolute certainty. We agree that in retrospect the option prices in some of the contracts were generous indeed, even to the point of encouraging the lessee's purchase of the equipment at the end of the lease term. Nevertheless, we are convinced that though generous, the substantial option prices were intended to do no more than extend a privilege to customers of petitioner for their leasing business, which concomitantly gave rise to an advantage for NAC in that it did not have to contend with disposal of the used machinery if the options were exercised. The option price set at the commencement of each lease was not, therefore, intended to force the lessee into an economic position such that it would have to exercise the option to make the lease a profitable venture. * * * [Footnote omitted.] When the relationship of the option price to the property's original cost is considered in light of Farms' economic situation at the time of the execution of the contract and the novelty of the venture, we likewise cannot conclude that the ultimate purchase of the property was an absolute certainty. In our opinion, of greater importance is the relationship between *377 the option price and the anticipated value of the property at the end of the primary term of the lease. As evidence by Mr. Adams' testimony and respondent's own determination, the improvements and equipment were subject to rapid depreciation and were expected to be substantially, if not fully, depreciated by the end of the primary term of the lease. In view of this fact, we are unable to conclude that the option price was substantially less than the anticipated value of the property at the end of the primary term. In fact, like the situation of the taxpayer in Breece Veneer and Panel Co. v. Commissioner,232 F.2d 319 (7th Cir. 1956), revg. a Memorandum Opinion of this Court, a substantial payment was required to make Farms the owner. In addition to the factors discussed above, we consider a number of other facts to be significant in our attempt to ascertain the intent of the parties. First, there was apparently little concern during the negotiations over the ownership of the property after the primary term of the lease, or any extensions thereof, a factor considered by the court in Oesterreich v. Commissioner,226 F.2d 798, 803 (9th Cir. 1955). *378 Mr. Adams testified that there was little discussion devoted to the option to purchase during the negotiations and that it "was somewhat of an after-thought." After having carefully observed his demeanor on the witness stand, we find his testimony worthy of belief.Second, there is no evidence that tax motivation was a force in structuring the transaction, a fact noted by the Courts in Benton v. Commissioner,supra, and Bellingham Cold Storage Co. v. Commissioner,64 T.C. 51 (1975). Third, the payments under the agreement do not appear to exceed the fair rental value of the property. See Haggard v. Commissioner,24 T.C. 1124 (1955); Holeproof Hosiery Co. v. Commissioner,supra.Fourth, the expected life of the improvements was not materially greater, if at all, than the primary term of the lease. See Holeproof Hosiery Co. v. Commissioner,supra at 556. Finally, unlike many agreements which courts have found to have characteristics of a sale, there is no provision providing that a portion of the monthly payments will be credited against the option price. Breece Veneer and Panel Co. v. Commissioner,supra. *379 In conclusion, we are convinced that there is no reasonable economic basis to infer that a sale of the subject property by Cargill to Farms was intended. We are satisfied that the lease provisions which tend to shift the risks of ownership to Farms were merely the result of Cargill's attempt to minimize its own business risks. This is also true of the option to purchase. From Farms' view-point, the inclusion of the option to purchase was nothing more than a reflection of its hope of acquiring the property if the venture proved successful. As the Seventh Circuit pointed out in Breece Veneer and Panel Co. v. Commissioner,supra at 323: Manifestly, one who takes an option does so with the hope of exercising it, but the hope does not create an equity. * * * Accordingly, after a careful review of the entire record, we conclude that the substance of the transaction was not a sale of the subject property by Cargill to Farms. We must now face respondent's alternative contention that the transaction was a mere financing arrangement whereby Cargill provided financing for Farms and used the Agreement of Lease as a form of security device. This contention *380 is closely related to respondent's initial contention and some of the factors previously discussed will be important in the resolution of this question. Frito-Lay, Inc. v. United States,209 F. Supp. 886 (N.D. Ga. 1962), cited by respondent, is clearly distinguishable. In that case the taxpayer acquired land in 1950 at a cost of $49,824 for use as the site of its proposed plant facility. However, the Korean War delayed the construction of the plant. On August 24, 1955, the land was transferred to a wholly owned subsidiary formed for the sole purpose of taking title to the land. On September 14, 1955, the land was conveyed to the company selected to construct the proposed plant facility in return for a non-interest bearing promissory note in the amount of $49,824 due in approximately 20 years. On the same day, the taxpayer leased the land and the plant to be constructed thereon from the construction company for a period of 20 years and the subsidiary received an option to purchase the land at the time of the expiration of the lease for $49,824. The agreement provided for an annual payment equal to 7-1/2 percent of the plant's total cost of $1,579,910 over *381 the 20-year term of the lease. The plant had a useful life of 33-1/3 years. On December 20, 1955, the construction company assigned its interest in the lease to an insurance company. After noting the taxpayer's concern over the disposition of the land and building upon the termination of the lease and the fact that the property could be acquired by the subsidiary by the mere cancellation of the promissory note, the district court held that the taxpayer never relinquished title to the property and, therefore, the payments did not constitute rent. The facts in the instant case are in sharp contrast with those in Frito-Lay, Inc. First, unlike the land in that case, none of the subject property was owned by Farms prior to the transaction. Second, as noted earlier, there was little concern during the negotiations over the disposition of the property at the expiration of the lease. Third, the expected life of the improvements was not substantially greater than the primary term of the lease. Fourth, unlike the option price in Frito-Lay, Inc., the payment which was required for Farms to become the owner was substantial in relation to the anticipated value of the property at the *382 expiration of the primary term. Finally, we cannot conclude, after a reading of the entire instrument, that Cargill intended to assign its interest in the lease to a lending institution. In fact, the inclusion of the provision for the payment of additional rent based upon the net profits of the venture seems to reflect a desire to retain a continuing interest in the project. Furthermore, the stipulation and testimony indicate that there had been no assignment of Cargill's interest at the time of trial, over ten years after the execution of the agreement. Cf. Frank Lyon Co. v. United States,536 F. 2d 746 (8th Cir. 1976), cert. granted 45 U.S.L.W. 3570 (February 22, 1977). The factors set forth above support petitioner's contention that the agreement was in substance a lease. Had the transaction been a mere financing arrangement with the lease agreement used as a amere security device, the transfer of title to the premises to Farms would have been an absolute certainty. However, there is no provision in the agreement requiring the payment of the amount designated as the option price at the end of the primary term. If the venture were unsuccessful, *383 thus rendering the premises useless to Farms, it was clearly free to decline its right to exercise the option. Accordingly, based upon the foregoing, we conclude that the transaction was not a mere financing arrangement whereby Cargill provided financing for Farms and used the Agreement of Lease as a security device. After a careful consideration of the entire record, we are satisfied that, under the Agreement of Lease, Farms was not taking title to or acquiring an equity in the property in question. The lease agreement constitutes neither a conditional sales contract nor a mere security device, but is in substance what it purports to be in form. Accordingly, we hold that the payments made under the lease agreement during the taxable years ending September 8, 1966 and May 27, 1967, constitute rental payments within the meaning of section 162(a)(3). Decisions will be entered under Rule 155.* Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. See generally Morris, Taxation of Leases: Profits and Pitfalls, 30 SW. L.J. 435↩ (1976).